JAMES EDWARD POWELL *v.* STATE OF
MARYLAND

[No. 189, September Term, 1972.]

*Decided January 29, 1973.*

686

The cause was argued before THOMPSON, GILBERT and SCANLAN, JJ.

*William H. Murphy, Jr.,* for appellant.

*Josef E. Rosenblatt, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *James B. Dudley, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

On the evening of April 24, 1970, Baltimore City police officers Donald Sager and Stanley Sierakowski were shot as they were writing reports in their parked squad car. Officer Sierakowski was shot 6 times and survived; Officer Sager died shortly after the attack. James Edward Powell was tried before a jury in the Criminal Court of Baltimore, Judge J. Harold Grady presiding, and convicted of the murder of Officer Sager and of assault with the intent to murder Officer Sierakowski. Consecutive sentences of life imprisonment and 15 years were imposed.

Appellant raises a single issue in his appeal to this Court. Did the pre-trial suppression by the prosecution of a scientific report violate his right to be afforded due process of law?

As numerous police cars were responding to the scene of the shooting, one of them, in response to a citizen's hail, stopped a few blocks from the shooting. The citi-

zen told the officers that there were two men trying to gain entrance to the rear of his store at 723 W. Lafayette Avenue. The officers left their car and proceeded up the alley toward the rear of the store. Enroute, the officers observed two men huddled under the back porch of a house. A resident of the house opened the door and told the officers the men were trespassing. One officer observed a revolver under the steps upon which the men were then sitting and the men were placed under arrest. One of these two men was appellant.

Along with the revolver, a Rohm .38 caliber, the officers also recovered a pair of men's black gloves. In the revolver's chamber were three live shells and three discharged shells. Several additional officers responded to the scene of the arrest and searched the area. Under a sandbox in the yard where the two men had been arrested were recovered a .32 caliber Omega revolver and a pair of men's brown gloves. The cylinder of this revolver contained three live shells and two spent shells.

The serial number of the Rohm revolver was checked through the Maryland State Police and was shown to have been purchased from a licensed firearms dealer by appellant in 1969. A bullet recovered during the autopsy performed on Officer Sager was shown to have been fired from this revolver. Several .38 and .45 caliber bullets were found at the scene of the shooting. Some of the .38 caliber bullets were identified as having been fired from the Rohm revolver. One .32 caliber bullet was found at the scene, but that bullet was so mutilated that it could not be positively identified as having been fired by the Omega revolver.

Appellant contests none of the facts or circumstances related above. His sole contention is that because an Assistant State's Attorney intentionally concealed the exculpatory results of scientific tests performed on certain pieces of physical evidence, he was denied due process of law. His argument and his reasoning are that, aside from his prior purchase of the death weapon and

its subsequent recovery at the scene of his arrest, there was no evidence connecting him with the crime. He contends the suppressed results of the scientific tests would tend to show that he was not one of the police officers' assailants.

There was testimony at trial that on the day after the shooting, April 25, 1970, there were delivered to the Scientific Crime Detection Laboratory of the United States Treasury Department swabs of the hands of appellant, his co-arrestee, and another person, and both pairs of gloves found at the scene of appellant's arrest. These items were to be subjected to neutron activation analyses, the results of which tests, if the elements antimony and barium were present, would indicate that a firearm had been discharged in close proximity to the material tested. Nowhere in the record does it appear when these tests were completed nor when the results of these tests were made known to State officials.

On January 25, 1971, there was hand delivered to the Assistant State's Attorney a Motion for Discovery and Inspection. Of the 41 requests itemized, there was included a request to furnish a list of the names and addresses of all witnesses "who will or might be called upon to testify for the State at trial." Other requests were to furnish "copies of any and all statements or reports of prosecuting witnesses, made at any time or place, which have been reduced to writing," and "any information . . . which information is as to this defendant exculpatory." The last request was "to furnish the defendant complete copies of any ballistics report, chemical, mechanical, or other, tests."

The State's answer to appellant's motion was filed December 10, 1971. The State itemized 93 persons on their "List of Witnesses;" the last entry was "Maynard J. Pro U.S. Treasury Dept. Research and Methods Lab." The State declined to furnish the requested statements or reports because "as presently drafted . . . [the request] is not within the purview of Maryland Rule 728." The

State did consent, however, to "make available for inspection all items, including reports, photographs, bullets, charts, diagrams and analyses which the state intends to introduce at the trial."

The results of the neutron activation tests conducted on the materials delivered to the Treasury Department were not made available to appellant prior to trial. The appellant alleges that orally, the prosecutor materially misrepresented to his counsel the results of those tests.

At a recorded chambers conference held the morning before the trial began, the court asked the prosecutor whether he could be more specific in limiting his list of witnesses to those he reasonably expected to call either on direct or on rebuttal. Among the sixteen prospective witnesses the prosecutor designated, was Maynard Pro. During the next six trial days the State presented its entire case. At a bench conference, after the State rested, one of appellant's counsel charged that "the State has been playing cagey with us about one of its witnesses they alleged was vital in this case, Maynard Pro." Counsel expressed surprise the State had not called Pro; however, he asserted the defense had, during trial, subpoenaed Pro at the address supplied by the State. He had spoken with Pro a few minutes ago and found that the subpoena had not been served. He stated that "in view of the fact that we have requested every day of trial and before trial a copy of Mr. Pro's report, we would request now he [the prosecutor] give us a copy under *Giles* because we have a strong reason to believe it is exculpatory." The prosecutor stated his position that "the report of Mr. Pro, not called as a witness in this case, does not fall within the purview" of discovery. He asserted his willingness to provide the court with a copy of the report for its determination as to its nature and value to the defense. He requested the court not show the report to the defense because they had "subpoenaed Mr. Pro without having the slightest idea what he is going to say . . . He is now their witness for good or

for bad. If he had asked him five minutes ago on the phone, he would have found out what the report was about." Defense counsel reminded the court that the prosecution had "promised us every day last week as soon as he got a copy of his report, he would give it to us." Co-counsel added, "Now [we] find today he had the report all along." The prosecutor interjected, "If he is called as a witness." The court determined that the prosecution possessed Mr. Pro's written report and directed that he provide copy thereof to the defense.

In chambers the following morning, defense counsel stated they had had the report overnight and had met with Mr. Pro. One asserted that the prosecutor had "made two deliberate misrepresentations"; briefly they were: (1) the prosecution had indicated the gloves found with Powell's revolver contained evidence of gunshot residue when Mr. Pro's report showed that in fact they did not; (2) the prosecutor numerous times denied having Mr. Pro's report but promised to deliver it to the defense as soon as he acquired it when, in fact, he had been in possession of the document for some time. The defense claimed prejudice on two grounds, only one of which is of any significance here as the other was settled by stipulation. He claimed to the trial court that the defense had been prejudiced in that they had been deliberately denied the report to use in opening remarks to the jury.

Accepting the trial court's invitation to make a statement, the prosecutor implicitly denied misrepresenting the results of the tests performed by Mr. Pro and specifically stated that "with respect to the divulgence of the report to the defense, I indicated if and when the State called Mr. Pro as a witness, a copy of the report would be provided to the defense . . . Up until that time [the State] declined to provide a copy of the unexplained result of the examination." He elsewhere argued that the State felt that the report of itself showed nothing

unless explained by the person who administered the test.

The defense withdrew its previous motion for a mistrial and moved for a directed verdict "on the basis of this tactic by the prosecutor which has prejudiced our case and which has kept us from presenting it in its best light so far as to the jury."

The court explained its understanding of the posture of the defense's motion:

"[T]hat not being in possession of this information, whether it be exculpatory or not, it was not possible to include a reference to it in the opening statement . . . The motion made by defendant's counsel, as already indicated, while there was a failure to disclose this information which may or may not have been correct, I am not in the position to say that, but the fact is at the time the defendant's case was ready to be undertaken, both the statement was furnished and the witness has made himself available so that I do not see where any material prejudice has resulted." He continued, "Opening statements are statements of what counsel expect to be able to prove during the trial of the case and if the evidence is disclosed during the trial, and now, obviously, this matter cannot be included in the opening statement, but the opening statement is not decisive on the question of what evidence is going to be presented thereafter, and I believe under the present posture of the case if there is any evidence helpful to the defendant, it will be presented to the jury. Consequently a motion for a directed verdict is denied."

The court having determined there was no prejudice did not resolve any factual issues.

The defense then began to present its case; Maynard Pro was called as a witness and testified that there were

no traces of barium or antimony on the gloves found with appellant's revolver nor upon his hands. He added, however, that the fact that appellant was finger-printed and had washed his hands prior to the taking of the swabs might have affected the tests because the test "is only good from the time you fired the gun to the first washing." In response to a hypothetical question, Pro testified that if a person washed his hands after firing a gun "the barium and antimony would be washed off. In most cases he would remove all of it." Barium and antimony were on one of the brown gloves found in the yard near the .32 caliber revolver.

Although there is authority that an accused who is prejudiced by reason of the suppression of exculpatory evidence can obtain a new trial, we are aware of no authority which says he is entitled to an acquittal. Cases in Maryland and elsewhere are collected in 34 A.L.R.3d 16. We will consider the issue of prejudice nonetheless.

In its most recent decision concerning suppression by the State of evidence favorable to an accused, *Moore v. Illinois,* 408 U. S. 786, 92 S. Ct. 2562, 2568, 34 L.Ed.2d 155 (1972), the Supreme Court applied the rules laid down in *Brady v. Maryland,* 373 U. S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963). After a short summary of *Brady,* the Court directed consideration of the following factors: (1) suppression by the prosecution after a request by the defense; (2) the evidence's favorable character for the defense; and (3) materiality of the evidence. It stated, "These are the standards by which the prosecution's conduct in Moore's case is to be measured." In *Brady,* the suppressed evidence was a confession by a co-defendant admitting committing the act of killing for which Brady was being charged; evidence clearly material to Brady's case. In *Moore,* several eyewitnesses to a shooting identified the petitioner as the assailant. The Court held that evidence of one misidentification by a witness, suppressed by the prosecution, "was not material to the issue of guilt," and affirmed the petitioner's conviction.

Powell's appeal is founded on the proposition that the result of the neutron activation analysis of the gloves found with Powell's gun was exculpatory evidence. The Supreme Court has not specifically defined the term exculpatory evidence, the Courts of this State, however, have. In *Ross v. Warden*, 1 Md. App. 46, 227 A. 2d 42, 46, we stated:

> "The test in determining when a suppression of evidence can be said to amount to a denial of due process is that the evidence withheld was admissible, useful to the defense and capable of clearing or tending to clear the accused of guilt—i.e. exculpatory, or of substantially affecting the punishment to be imposed."

See *State v. Giles*, 239 Md. 458, 212 A. 2d 101, 108 (1965), vacated on other grounds, 386 U. S. 66, 87 S. Ct. 793, 17 L.Ed.2d 737 (1967). Our decision in this case, however, does not rest upon the characterization of the evidence as exculpatory or otherwise, but rather, upon whether there was such prejudice as to deny the appellant due process of law.

The appellant's trial began on Monday, January 10, 1972. It was recessed on Friday, January 14 and resumed at 10 o'clock Monday morning, the 17th of January. Before the case was called on the morning of January 18, the passages above recited wherein appellant's counsel charged the prosecution with deliberate misrepresentation took place. Defense counsel admitted having possession of the report overnight before meeting with Mr. Pro that morning before the chambers conference. Based on these occurrences, the trial court, as noted above, denied the defense's motion for a directed verdict after finding no material prejudice.

Appellant claims prejudice because he was denied the use of the results of Mr. Pro's test in his opening address to the jury. We said in *White v. State*, 11 Md. App. 423, 274 A. 2d 671, 675:

694

> "Maryland is clearly in line with this major-
> ity position that the office of 'an opening state-
> ment in a criminal prosecution is to apprise,
> with reasonable succinctness, the trier of facts
> with the questions involved and what the State
> or defense expects to prove, so as to prepare
> said trier of the facts for the evidence to be
> adduced. * * * and it generally has no binding
> force or effect.' *Clarke v. State,* 238 Md. 11, 19-
> 20, 207 A. 2d 456, 460-461."

The defense summoned Mr. Pro as its witness; it con-
tacted Pro before the State rested; it received the re-
port of the scientific analyses at the end of the State's
case; had it for study and evaluation before resumption
of the trial on the 18th of January; it consulted with
Pro before the defense began presenting its case; it called
Pro as a defense witness; and elicited from Pro the re-
sults of his scientific test. We agree with the trial court
in its finding that under the circumstances in which the
posture of this case developed, the availability of Mr.
Pro's information for the defense counsel's possible use
in his opening statement did not prejudice appellant. It
is sufficient the defense had possession of the informa-
tion in time to make use of it during the trial. The evi-
dence did not by any means preclude the possibility, or
indeed the probability, under all of the circumstances,
that appellant was one of the criminals. The evidence
merely tended to show that the assailant did not use the
black gloves when the gun was fired. The evidence indi-
cates that appellant washed his hands prior to the time
the test swabs were taken. In any event, for whatever
the evidence was worth it was presented to and consid-
ered by the jury. See *Shotkosky v. State,* 8 Md. App. 492,
261 A. 2d 171.[1]

*Judgments affirmed.*

---

1. The public prosecutor is an official of the executive branch
of government. His duty is to seek justice and not merely con-
victions. "Society wins not only when the guilty are convicted

but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly . . . a prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on a defendant." *Brady v. Maryland, supra,* 83 S. Ct. at 1197. See *Ethical Consideration* 7-13 and *Disciplinary Rule* 7-103 of the Code of Professional Responsibility of the American Bar Association.

We do not wish our decision to be construed as in any manner approving misleading statements by the prosecution to defense counsel or the withholding of exculpatory evidence. Our decision is simply that there was no prejudice. The trial court did not decide whether the prosecutor did in fact intentionally mislead defense counsel concerning either his possession of, or the results of, Pro's report, nor do we. We do caution prosecutors that a literal compliance with Md. Rule 728 may not always satisfy the requirements of *Brady v. Maryland, supra.*