WALTER A. YOUNIE *v.* STATE OF MARYLAND

[No. 131, September Term, 1973.]

*Decided November 28, 1973.*

440

The cause was argued before MORTON, MOYLAN and MOORE, JJ.

*William F. Mosner* for appellant.

*Mary Elizabeth Kurz, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Samuel A. Green, Jr., State's Attorney for Baltimore County,* and *John J. Lucas, Assistant State's Attorney for Baltimore County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The appellant, Walter A. Younie, was convicted in the Circuit Court for Baltimore County by a jury, presided over by Judge H. Kemp MacDaniel, of first degree murder and armed robbery. He now contends:

(1) That the State deliberately suppressed material evidence favorable to him in contravention of *Brady v. Maryland,* 373 U. S. 83; and

(2) That the court erroneously permitted an interrogating detective to recite to the jury the fact that the appellant refused to answer certain specific questions, which questions and nonresponses were interspersed in a series of admittedly proper questions and answers.

Both issues may be more intelligibly viewed in the context of the total case implicating the appellant. On December 27, 1971, at approximately 7:30 p.m., Reuben J. Kaufman, an employee at the B & F Liquor Store on Pulaski Highway in Baltimore County, was killed by a shotgun blast at close range in the course of an armed holdup. Two hundred and sixty-five dollars were taken in the course of the robbery. A number of witnesses established uncontrovertedly that three men had been observed parked near the store, in a dark-colored Cadillac, shortly before the robbery. Another witness, shortly thereafter, saw two men running out of the store, one of them carrying a shotgun.

At approximately 8:15 that same evening, the police discovered a recently burned out Cadillac abandoned near the intersection of Macon Street and Erdman Avenue in Baltimore City. A computerized records check revealed that the Cadillac had recently been stolen from its owner in Quincy, Massachusetts. It was, however, bearing Connecticut license tags issued on December 9, 1971, to

Adelbert Grondin of Hartford, Connecticut. Zeroing in on the name Grondin, the police began to check motels and hotels in the Baltimore area. At approximately 9:30 a.m. on December 28, the police discovered that Adelbert Grondin and an ostensible John McCarron had at 12:45 p.m. on the preceding afternoon checked into the New Motel on Route 40, in the general vicinity where the burned out Cadillac was found. They had checked out, however, at 8:50 a.m. on December 28, some 40 minutes before the police arrived. They had left in a Sun Cab. The motel clerk identified photographs which indicated that the ostensible John McCarron was in fact John D. McCormack. A taxicab driver recalled picking up two men from room 58 (the room where Grondin and McCormack were registered) and driving them "as far west as they could go for $6." He dropped them off at the Normandy Shopping Center on Route 40 west of Baltimore. Both Grondin and McCormack were arrested a short time later in Frederick, Maryland.

At shortly before midnight on December 27, the police began discovering parts of a dismantled shotgun and live shotgun shells in the general vicinity of the burned out Cadillac and of the New Motel. Proceeding from the robbery scene westward on Pulaski Highway, the police found one spent shotgun shell near the curb of Pulaski Highway, one and six-tenths miles from the robbery scene. Proceeding further westward on Pulaski Highway and then by way of Erdman Avenue to North Macon Street, the police came to the burned out Cadillac, an additional two and one-half miles from where the spent shotgun shell was recovered. A short distance away from the burned out Cadillac near the Penn Central Railroad tracks, the forestock of the shotgun was found. Across the street, 138 feet away, the double barrel of the shotgun was found. Sixty-seven feet away, the stock was found. The gun was a 16 gauge sawed-off shotgun. It was missing the trigger guard. Within a radius of 100 feet, three live shotgun shells were recovered. From that vicinity, North Kresson Street leads to Monument Street, a tenth of a mile away. Along the North Kresson Street route, a fourth live shotgun cartridge was found. From the intersection of

North Kresson Street and Monument Street, it is two-tenths of a mile to the New Motel.

Astute police work tracked the investigative spore back to Hartford, Connecticut. Two separate witnesses established that 1) the appellant, 2) McCormack, 3) Grondin and 4) the appellant's traveling companion named Loretta Scully had been together in Hartford throughout the week preceding Christmas and had left on or about December 26. One witness testified that the foursome drove around Hartford in a blue Cadillac and that the Cadillac was bearing Connecticut license tags which had been issued to Grondin. Both witnesses, who knew the appellant well, identified the reassembled shotgun as similar to the sawed-off, 16 gauge shotgun which each had seen on separate occasions, in the apartment of one and in the place of business of the other, in the possession of the appellant. One was aware that the appellant's shotgun lacked a trigger guard and testified further that the appellant was very reluctant to let the gun out of his own hands and refused to permit anyone else to touch it.

Loretta Scully was granted immunity and testified as a State's witness. She testified that she left Hartford on December 26 in the company of the appellant, McCormack and Grondin. They first drove to Boston to pick up her pocketbook and then drove to Baltimore. The appellant drove the Cadillac and Miss Scully thought that the car was his. They checked into the New Motel in Baltimore in the early afternoon of December 27, all four of them sharing the room which was registered only to McCormack and Grondin. Miss Scully took a nap after her three male companions left the motel room at approximately 3 p.m. They returned at approximately 8:30. Because of their loud and excited conversation, Miss Scully asked the three what was wrong. McCormack informed her that they had robbed a liquor store and that in the process, a man had been shot. The appellant confirmed the robbery and told Miss Scully that he had done the shooting. She had seen the appellant with the sawed-off shotgun in Connecticut but had not seen it in the car during the trip to Baltimore. Her three male companions

told her that they had stopped on the way back from the robbery and set the car on fire. They had then returned to the motel on foot. She observed them place approximately $200 on the bed. It was separated into three piles. Each of the three men took one of the piles. After hearing a news broadcast about the murder on the following morning, it was agreed that the party would split up into two groups and meet later in Columbus, Ohio. Miss Scully left with the appellant and drove to the Greyhound Bus Terminal in downtown Baltimore. They took a bus to Wheeling, West Virginia, and then hitchhiked on toward Columbus, finishing the journey in a stolen car. When Grondin and McCormack failed to show up for the rendezvous, Miss Scully and the appellant continued westward. They were ultimately arrested in Putnam, Indiana, when they pulled away from a gas station without paying.

The appellant, furthermore, after having been given full *Miranda* warnings, had made incriminating admissions to the police to the effect that he knew both McCormack and Grondin, that he drove the dark blue Cadillac to the armed robbery scene although he denied going in, that the Cadillac had been stolen from Quincy, Massachusetts, that the Cadillac had been left near a railroad underpass after being set on fire, that he had come from Hartford with Loretta Scully who stayed at the New Motel, and that Loretta Scully did not know that there was going to be a holdup. He does not now attack the admissibility of those statements.

### The Suppression Question

Added to that overwhelming evidence of guilt was the testimony of an eyewitness, Irvin Lambdin. It is on the periphery of Mr. Lambdin's testimony that the suppression issue is raised.

Mr. Lambdin, a regular patron of the B & F Liquor Store, drove up to the store on the evening of December 27 with the intention of purchasing a case of beer. As he approached the front door, some unarticulated premonition caused him to hesitate. He had observed that only two cars were on the

parking lot, one of which he assumed to be the store manager's and the other of which was a Cadillac. He discerned a male form in the Cadillac. From the silence in the store and from the holiday season (which he described as a time of high incidence for robberies), he felt a sixth sense awareness that trouble was afoot. He retreated to the rear of his own automobile. He was standing there, curious and observant, when he saw two men burst from the store and run for the Cadillac. The second of the two men was carrying a sawed-off shotgun. The gun was thrown on the floor of the car, the two men jumped into the Cadillac, and the Cadillac took off at a high rate of speed. Mr. Lambdin later identified the burned out Cadillac as the one which he had observed in the front of the liquor store. He identified the reassembled shotgun as similar to the one he had seen in the hand of one of the robbers.

Mr. Lambdin also testified that as the second of the two men, the one carrying the gun, ran for the Cadillac, he pulled a stocking cap off his head, revealing long, shoulder-length blonde hair. Although Mr. Lambdin could not identify any of the assailants by face, he did give the following response at trial:

"Q. Would you describe the color of the hair of the person you saw carrying the shotgun?

. . .

A. I did.

Q. Repeat it.

A. Ash-blonde down to shoulder level, blonde hair.

Q. Would you look at the hair of the Defendant in this case and tell the Court and the Jury whether or not his hair is like the hair of the one you saw carrying the shotgun or similar?

A. Identical."

The thrust of the defense was to impeach this testimony of Mr. Lambdin that he had observed "shoulder level, blonde hair" by showing that he failed to pass on any such

description to the first police officer who arrived upon the scene. That policeman was Officer Dale Schulz.

The defense theory is disingenuous. Mr. Lambdin was steadfast in his testimony that he remembered vividly the shoulder length, ash-blonde hair. He also recalled that he had passed this description on to Officer Schulz. The defense argument, in effect, runs that if Officer Schulz did not record this description, then the description was never given to him by Mr. Lambdin. The defense conclusion is, therefore, that Mr. Lambdin never observed the shoulder length, blonde hair, identical to that worn by the appellant at trial.

The defense sought directly to impeach Mr. Lambdin's testimony by offering an eight-line statement given by him, and in his own handwriting, at 9:08 p.m. on December 27—within an hour and one-half of the occurrence of the robbery-murder. That statement read:

> "I saw this man carrying a shotgun come running out of this package goods store an got into a dirty Cad car an went south on the Highway toward Balto. City. The man had on rough clothes, 6 ft. — 190 lbs. with long hair & stocking hat — *seaman* he had on dark clothes. I think it was 3 Males. *White.*
>
> Police took me to see the getaway car an I said that I though it was after looking at it."

Mr. Lambdin acknowledged that although his statement included the adjective "long," it did not include the adjective "blonde." He could only attribute the omission to the excitement of the moment:

> "A. I must have left the blonde hair out.
>
> Q. Why did you do that?
>
> A. In the excitement a lot of things happened, you know."

We do not find the omission of the adjective at all remarkable. The hasty summary, drawn by an untrained layman, did not purport to be an exhaustive or definitive deposition.

Neither do we find it remarkable that Officer Schulz,

upon returning to the station house several hours later, and while completing a 47-item crime report, filled the single line provided for him to identify the suspect with the following entry, "Unk. M/white wearing stocking cap over head." The defense seeks to make a standardized police form into something which it clearly is not. We point out that we are dealing here not with an item in a police report which contradicts trial testimony. We are dealing rather with police reports which, by their very nature, purpose, and the circumstances in which they are made, omit inevitably the full detail of trial testimony. The defense notion, frequently raised in this Court, that prosecution testimony must be limited, by way of impeachment at least if not by way of total exclusion, to what is contained in police summaries is specious. It fails utterly to comport with the non-sophisticated reality of police officers, who are not legal technicians, 1) hastily scribbling a penciled note or two in the excitement of a crime scene or 2) laboring to complete their various forms and reports back at the station house before knocking off the shift. Austerity of language is of the very nature of the medium.

The appellant posits the omission of the adjective as proof of the negative proposition: IF THE POLICE DID NOT RECORD THE DESCRIPTION, THE WITNESS NEVER GAVE THE DESCRIPTION AND LIED WHEN HE SAID THAT HE DID; IT FOLLOWS THAT THE WITNESS NEVER MADE THE OBSERVATION AND IS TO BE DISBELIEVED. The factual premises are by no means established. Mr. Lambdin, at worst, failed to tell the police that the long hair which he had observed was "blonde," and was mistaken in his recollection that he had so told the police. Even this minor inadequacy is, however, by no means established. Officer Schulz, in complete candor, testified that he could not recall the description which he received at the crime scene that night:

> "Mr. Lambdin gave me a description of two of the subjects. Now, the exact description which he gave me I cannot remember. As he was giving me the description I was putting it right out over the radio."

448

Not having been able to rely upon Officer Schulz to impeach (by contradicting) Mr. Lambdin even as to this peripheral detail, the appellant now claims that he was unfairly denied the opportunity to do indirectly that which he failed to do directly. He asserts that the State unconstitutionally suppressed evidence favorable to him in contravention of *Brady v. Maryland, supra.* He charges "that the prosecutor knew that this testimony was false and that the police had in their possession recorded tapes of the broadcast which clearly proved that no reference to 'long, blond hair' had ever been made in describing the suspect. The tapes were not made available to Appellant so that he could use them to refute Lambdin's testimony."

The whole argument hangs by a slender thread. Mr. Lambdin recalled that as he made his report to the first police officer to arrive at the scene, that officer was putting out the alarm over the police radio. Mr. Lambdin did not testify at any time that he recalled hearing the words the officer used in reporting the incident to his headquarters over the radio. He simply recalled that the officer he spoke to was in radio contact with other police. Officer Schulz, in turn, could not recall the description given to him by Mr. Lambdin. He did testify that as he received the description, he was putting it out over his police radio:

> "Mr. Lambdin gave me a description of two of the subjects. Now, the exact description which he gave me I cannot remember. As he was giving me the description I was putting it right out over the radio."

Officer Schulz pointed out that his radio transmission would have been recorded. He explained at that point:

> "At that time I couldn't make any notes due to the fact I knew this would be all recorded, and if any question was to [be] brought up it could be checked through the recording as to exactly what he told me because I put the exact thing right on the radio."

He testified at another point that he was sure that he

accurately relayed over the police radio whatever description had been given to him:

"Q. What would you have felt to be more important, the fact that the subject was wearing a stocking cap or that he had long blonde hair?

A. Both would be important.

Q. Would you have put one in and not the other for any reason, officer?

A. The only way I might have deleted one is by forgetting one of them, but I gave the exact description he gave me over the radio."

The appellant's thesis is that the State suppressed the tapes and that the tapes would have impeached the testimony of the eyewitness Mr. Lambdin.

Our rejection of the appellant's contention is manifold. We note initially that even if we were to assume an unconstitutional suppression (which assumption, for reasons hereinafter to be discussed, we most definitely do not make), we are persuaded that the error would have been harmless beyond a reasonable doubt under the guidelines of *Chapman v. California,* 386 U. S. 18, 87 S. Ct. 824, 17 L.Ed.2d 705 (1967). We reach that conclusion in two independent regards. In view of the overwhelming evidence of the appellant's guilt—including his independently established connection with both the blue Cadillac and the shotgun, his arrest in company with Loretta Scully, the directly incriminating testimony of Loretta Scully, and the damning admissions of the appellant himself—the mere lost opportunity to impeach the eyewitness Lambdin on an, at most, speculative theory as to a collateral detail would not, we hold, have given rise to "a reasonable possibility" that the omission "complained of might have contributed to the conviction." *Fahy v. Connecticut,* 375 U. S. 85, 86-87, 84 S. Ct. 229, 11 L.Ed.2d 171, 173 (1963). The whole point was so tangential and remote that we simply do not think it would have affected the jury's judgment one way or another.

Again assuming error (only *arguendo*), we would find it,

beyond a reasonable doubt, to be harmless for the additional and independent reason that the appellant was not prejudiced—that he was not deprived, in actual fact, of the arguably favorable stuff he claims to have been denied. Indeed, a thorough review of all the final arguments and the instructions to the jury indicates that the appellant got a mileage out of his speculative and tangential thesis far beyond its just desserts. A triviality to begin with, it was inordinately spotlighted, with the appellant as the only possible beneficiary of the undue emphasis. At the appellant's behest, the court gave the following instruction:

> "Before going into that indictment, one further instruction I wish to give you. The Jury is instructed if the State without satisfactory explanation fails to call an available witness or to produce available documentary evidence on a material issue, it may be inferred the testimony or document will be unfavorable to the party who fails to produce such evidence."

Subsequent argument from both the State and the appellant's attorney made it clear that the foregoing instruction had reference only to the police tapes. The arguments, furthermore, probed and dissected with painstaking thoroughness the whole issue of the tapes. The State, in its initial argument to the jury, made the following reference:

> "At that point there is obviously some conflict between what Lambdin is saying and what Officer Schulz is saying, a question of long hair or short hair and the color of it. I can only assume the inference you would take from this and from the State's reaction to it, that had the police tapes revealed a description of someone with long, ash-blonde hair you would be listening to radio tapes from Police Headquarters, and since the tapes did not reveal that the tapes were not presented."

The appellant's attorney developed his entire thesis fully and effectively:

"Along those lines the Court has instructed you that if the State without satisfactory explanation fails to call an available witness or to produce available documentary evidence on material issues — and what can be more material than the description of the man with the shotgun? — it may be inferred that the testimony or the document will be unfavorable to the party who fails to produce such evidence. That is the law.

The police here have told you that they have a system when a broadcast is put out over the radio that all of those tapes are saved so they can show what went out over the airways. What has been produced in Court by the State to indicate a transcription of what went out on December 27th, 1971? Nothing. Judge MacDaniel said because of that failure you should infer that that evidence would be unfavorable to the State. We suggest, ladies and gentlemen, it was not produced because there was no mention of blonde hair and there was no mention of blonde hair because Mr. Lambdin didn't say the man had blonde hair because he didn't see a man with blonde hair until he came in Court and saw Walter sitting next to me. He also told you he gave the same information to Lieutenant Roemer. Lieutenant Roemer has been in this Courtroom for three days. Did he testify and say that Mr. Lambdin told him the suspect had blonde hair? He did not. Judge MacDaniel has told you when that happens you should infer he did not so testify because he couldn't testify."

In rebuttal to that argument, the State confirmed the very inference which the defense was seeking to have the jury make:

"Now, Officer Schulz didn't put down on his report the man had long, blonde hair. He says maybe the man told him but there is no way of knowing whether Mr. Lambdin did or did not tell

Officer Schulz the man he saw when he pulled the hat off had long, ash-blonde hair. There is no way to say that Mr. Lambdin is lying. Officer Schulz said he may have told him that and in the excitement of getting the information on the police radio while it was hot he could have missed it. He is not sure. The inference, then, is the State is trying to hide or conceal evidence. Why? Why would we conceal evidence? The tapes were played after it was brought out in Court and I personally heard the tapes there was no description of long, ash-blonde hair. Why should I bring them over? But you can rest assured if it was on here the tapes would have been here. So why waste the Court's time and your time? But no one can say that. Mr. Lambdin was lying about the description he gave to the officer."

For whatever he wished to make of it (and he made a lot of it), the appellant was simply not denied the effective use of the issue.

For reasons now to be explored, however, we point out that there was no error in that there was no unconstitutional suppression of evidence by the State. The constitutional peg on which the whole suppression issue hangs is the due process clause of the Fourteenth Amendment. The fountainhead of present constitutional law on the subject is *Brady v. Maryland*, 373 U. S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963).[1] Evolving from the more modest holdings in *Mooney v. Holohan*, 294 U. S. 103, 55 S. Ct. 340, 79 L. Ed. 791 (1935), and *Pyle v. Kansas*, 317 U. S. 213, 63 S. Ct. 177, 87 L. Ed. 214 (1942), that the due process clause was offended whenever the state had made knowing use of perjured testimony and in *Alcorta v. Texas*, 355 U. S. 28, 78 S. Ct. 103, 2 L.Ed.2d 9 (1957), and *Napue v. Illinois*, 360 U. S. 264, 79 S. Ct. 1173, 3 L.Ed.2d 1217 (1959), that the due process clause

---

**1.** See generally Comment, *Prosecutor's Constitutional Duty of Disclosure—Developing Standards under Brady v. Maryland*, 33 U. Pitt. L. Rev. 785 (1972); Comment, *Brady v. Maryland and the Prosecutor's Duty to Disclose*, 40 U. Chi. L. Rev. 112 (1972).

was also offended when the state had knowingly allowed false evidence to go uncorrected even though it had not affirmatively solicited the false evidence, the Supreme Court in *Brady* finally held that the due process clause would be offended if the state even suppressed evidence which might, under certain guidelines, be favorable to the accused. The precise holding of *Brady* was, at 373 U. S. 87:

> "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

The Court expanded somewhat on that holding, at 373 U. S. 87-88:

> "A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice, even though, as in the present case, his action is not 'the result of guile,' to use the words of the Court of Appeals."

Maryland had, indeed, anticipated the Supreme Court with its decision in *Brady v. State*, 226 Md. 422, 174 A. 2d 167, the holding of which was left undisturbed by the Supreme Court decision. We have since applied the doctrine on a number of occasions. *Strosnider v. Warden*, 228 Md. 663, 180 A. 2d 854; *State v. Giles*, 239 Md. 458, 212 A. 2d 101, vacated on other grounds, *Giles v. Maryland*, 386 U. S. 66, 87 S. Ct. 793, 17 L.Ed.2d 737 (1967); *Austin v. State*, 253 Md. 313, 252 A. 2d 797; *Ross v. Warden*, 1 Md. App. 46, 227 A. 2d 42; *Smith v. Warden*, 7 Md. App. 579, 256 A. 2d 616.

In its more recent decision of *Moore v. Illinois*, 408 U. S. 786, 92 S. Ct. 2562, 33 L.Ed.2d 706 (1972), the Supreme Court reaffirmed and explicated its decision in *Brady*. It pointed

out that three factors must coalesce before a due process violation will be found. It said, at 408 U. S. 794-795:

> "The heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence."

In *Powell v. State,* 16 Md. App. 685, 299 A. 2d 454, Judge Thompson recognized and adopted for this Court the *Moore* analysis of *Brady*.

### Suppression by Prosecution after Request by Defense

The appellant at bar failed to clear even the first hurdle. He does not simply trip over it, but trips over it twice. In the first place, for reasons already fully discussed in pointing out the lack of prejudice within the context of harmless error, there was no suppression of any evidence by the State. By benefit of the appellant's strongly urged inference, acquiesced in by the State and strengthened by the Court's affirmative blessing, the fact finders were encouraged to read the tapes as favorable to the accused. The State, moreover, in its rebuttal argument, offered evidence (unobjected to by the appellant) confirming the absolute truth of the inference.

Just as significantly, in terms of a possible due process violation, the appellant failed to make any request for the police tapes. He was not operating out of ignorance, but became aware of the tapes and of their possible significance for him simultaneously with the State's becoming aware of the same matter. The knowledge was simply not hidden from him; process to obtain witnesses or evidence was as available to him as it was to the State.

In similar situations, the decisions of the Court of Appeals

and of this Court have been unanimous in rejecting allegations of unconstitutional suppression. In *Dyson v. Warden*, 233 Md. 630, 196 A. 2d 455, the Court of Appeals ruled that the State had not suppressed evidence of an allegedly exculpatory character from a witness it did not summons to the trial and whom the police were affirmatively admonished by the prosecutor not to interview. In terms of the failure of the defendant there to make a request for the evidence, Chief Judge Brune said for the Court, at 233 Md. 634:

> "A more fundamental defect in the applicant's contention seems to us to be that a refusal of prosecuting officials to interrogate a witness fully known to the defense about a matter clearly known to the defendant (if his version is true), which might have tended to support the defendant's explanation as to some of the money found on his person or nearby at the time of his arrest, does not constitute the concealment of evidence. This case differs sharply from *Brady v. State*, 226 Md. 422, 174 A. 2d 167, aff'd, *Brady v. Maryland*, 373 U. S. 83, where a confession of a co-defendant admitting that he, the co-defendant, had been the one who actually strangled the victim, was in the possession of the police, but was not disclosed to Brady. This confession we held, was material on the question of Brady's punishment, though not of his guilt. In other words, that confession was material, was known to the police and was not known to Brady. No comparable factors appear to be present here."

In *Hyde v. Warden*, 235 Md. 641, 202 A. 2d 382, the Court of Appeals rejected the notion that the State had suppressed allegedly exculpatory articles of clothing. It said, at 235 Md. 645:

> "With regard to contention (4), the alleged suppression of evidence by the State in not offering in evidence certain articles taken from the applicant at the time of his arrest and of the search

(of which he complains in contentions (1) and (2)), the record on appeal makes it clear that the applicant knew about these articles, which consisted of clothing which he had been washing just before his arrest. No blood stains were found on them when tested, which was, of course, after they had been washed. Such evidence does not seem material. In any event, in view of Hyde's knowledge of these articles, this contention is not supportable. *Dyson v. Warden*, 233 Md. 630, 196 A. 2d 455."

At issue in *Farrow v. Warden*, 241 Md. 724, 217 A. 2d 270, was a defense claim that the State had suppressed the results of favorable laboratory tests. In rejecting the contention, the Court of Appeals there said, at 241 Md. 726:

"Petitioner next claims that the state improperly suppressed the results of a laboratory study made on petitioner's clothes. Actually the tests were testified to in detail. In any case Judge Carter made a finding of fact that petitioner was aware of the tests and could have required production of the report. We find nothing to dispute this finding and of course it precludes any relief for the alleged suppression of evidence. *Hyde v. Warden*, 235 Md. 641, 202 A. 2d 382 (1964)."

In *McCoy v. Warden*, 1 Md. App. 108, 227 A. 2d 375, this Court dealt with a defense contention that the State had unconstitutionally suppressed laboratory tests of clothing. The ostensible significance of the tests was not that they exculpated the defendant, but simply that they failed to inculpate him—simply negative knowledge proving nothing. In addition to holding that the allegedly suppressed evidence was not material, we held that the request criterion had not been satisfied in that the defendant there "had knowledge of the clothing and could have proffered them if he thought them material. The record does not disclose a suppression of evidence amounting to a denial of due process."

Of similar import, and remarkably akin to the situation at bar, was our decision in *Powell v. State, supra.* At issue was

an allegedly exculpatory neutron activation analysis which failed to show that the defendant on trial for murder had any traces of incriminating barium or antimony on either the hands or the gloves that had ostensibly fired the lethal weapon. This inconclusive negative knowledge, though known to the State earlier, was not made known to the defense until well into the trial. The defendant there did learn of the information timely enough, however, to undertake overnight preparation and to produce the laboratory analyst in his defense on the following morning. We held that there was, therefore, no prejudice; implicit was the fact that the defendant there was put on notice of the evidence he wished in sufficient time for him to pursue his own investigation and to produce his own evidence, if he thought it would be material to his defense.

Similarly, we rejected, in *Johnson v. Warden*, 16 Md. App. 227, 232-234, 295 A. 2d 820, a defense contention that the State had unconstitutionally suppressed the fact that the defendant there had syphilis (an ostensibly exculpatory fact since the rape victim in the case never contracted syphilis), where the evidence was obviously known to the defendant himself and was, furthermore, known to his counsel in a situation where counsel chose, as a trial tactic, not to reveal the information to the jury. And see *Hopkins v. State*, 19 Md. App. 414,311 A. 2d 483.

## The Favorable Character of the Allegedly Suppressed Evidence

The second barrier which the appellant fails to clear is that of establishing that the allegedly suppressed evidence was of such a character as to be, demonstrably and not simply speculatively, favorable to his defense. His thesis, of course, was that if the police radio broadcast, as evidenced by the tapes, did not include the description of the suspect as having "blonde hair," then the witness Lambdin never made such an observation to begin with. That theory ignores the possibility that Mr. Lambdin may simply have been mistaken in recalling that he passed on that precise

description to the police, which mistake would not significantly impeach his credibility. It ignores the alternative possibility that Officer Schulz, in the confusion of the moment, did not hear the precise description as given to him by Mr. Lambdin, which would not be favorable to the defense in any way. It ignores the further possibility that Officer Schulz did hear such a description given by Mr. Lambdin but failed, again in the scurry and confusion of the moment, to pass on that precise detail, which also would not be favorable to the defense in any way. It ignores the further possibility that Officer Schulz did receive and pass on the precise adjective, but that the clerk who received the radio message did not accurately record it, which possibility again does not favor the defense in any way. It ignores the further possibility that the clerk did receive such a message but then somehow failed to be 100% accurate in putting out the ultimate bulletin over the airwaves, which possibility again fails to favor the defense in any way. The entire defense theory is, in short, speculative in the extreme.

Far less speculative was the defense theory advanced in *Moore v. Illinois, supra.* There, a witness had testified that he was sitting at a card table in a bar when he saw the defendant walk through the front door. At issue was a diagram prepared, after interviewing witnesses, by a police investigator. The diagram showed that the witness's position at the table was such that his back would have been to the door. The diagram was kept from the knowledge of the defense. The Supreme Court rejected the idea that the diagram was necessarily favorable to the defense because the defendant there had not established that the witness was necessarily looking straight ahead at the game of cards before him rather than turning in his chair to look in another direction. The Supreme Court there said, at 408 U. S. 798:

> "We are not persuaded that the diagram shows that Powell's testimony was false. The officer who drew the diagram testified at the post-conviction hearing that it does not indicate the direction in which Powell was facing or looking at the time of

the shooting. Powell testified that his position at
the table gave him a view of the bartender; that at
the moment he could not bid in the pinochle game
and had laid his hand down and was looking toward
the door when Moore walked in. There is nothing in
the diagram to indicate that Powell was looking in
another direction or that it was impossible for him
to see the nearby door from his seat at the card
table."

We are simply not persuaded that the evidence at issue
was favorable to the appellant here.

### The Materiality of the Allegedly Suppressed Evidence

If the appellant were not already sprawled upon the track,
he would in any event fail to surmount the third hurdle of
establishing that the evidence at issue was material—that
is, that it was "exculpatory" or "tend[ed] to clear the accused
of guilt." *State v. Giles, supra,* at 239 Md. 469. In dis-
cussing materiality in *Giglio v. United States,* 405 U. S. 150,
92 S. Ct. 763, 31 L.Ed.2d 104 (1972), the Supreme Court
said, at 405 U. S. 154:

"We do not, however, automatically require a new
trial whenever 'a combing of the prosecutors' files
after the trial has disclosed evidence possibly useful
to the defense but not likely to have changed the
verdict . . .' *United States v. Keogh,* 391 F.2d 138,
148 (CA2 1968). A finding of materiality of the
evidence is required under *Brady, supra,* at 87, 10
L.Ed.2d at 218. A new trial is required if 'the false
testimony could . . . in any reasonable likelihood
have affected the judgment of the jury . . . .' *Napue,
supra,* at 271, 3 L.Ed.2d at 1222."

On the question of materiality, *Moore v. Illinois, supra,* is
again instructive. In *Moore,* the defendant made a series of
absolutely incriminating admissions to a barroom
companion named Sanders. Sanders testified as to these
admissions and identified Moore in court as the man who

had made them. The allegedly suppressed evidence at issue there was a police investigative report which revealed that Sanders had identified to them the man who made the admissions as an acquaintance by the name of "Slick." He definitely placed his first meeting with "Slick" at a time when Moore himself was in prison in another state. The report revealed further that other witnesses knew "Slick" and knew him to be someone other than the defendant Moore. The Supreme Court nevertheless ruled that in view of other positive identifications of Moore as the killer, the one misidentification was not "material." The Court said, at 408 U. S. 797:

> "We conclude, in the light of all the evidence, that Sanders' misidentification of Moore as Slick was not material to the issue of guilt."

Indeed, when the allegedly suppressed evidence is not evidence which goes directly to the question of guilt but simply to the impeachment of a State's witness, the broad consensus of legal thinking is that far more will be required to establish materiality. In *Link v. United States*, 352 F. 2d 207, *cert. den.*, 383 U. S. 915, the Court of Appeals for the Eighth Circuit said, at 212:

> "Evidence material to guilt is, we think, evidence which is of probative character on that question. As to evidence not of that character and having admissibility only for the purpose of impeachment or credibility attack, nondisclosure or suppression, to be violative of due process, would in our opinion, unless the situation is otherwise tainted, have to be of such inherent significance as to represent fundamental unfairness."

Representative of the general state of the law is the Comment, *Prosecutor's Constitutional Duty of Disclosure—Developing Standards under Brady v. Maryland*, 33 U. Pitt. L. Rev. 785 (1972), at 795-796:

> "When we move into the gray area of impeachment testimony the courts have been more likely to hold

the defendant and his counsel to a higher degree of diligence in making a request for the evidence and to a higher standard of materiality before relief can be granted. This may be partially due to the fact most such evidence is neither exculpatory or favorable but is inherently neutral."

. . . .

Statements of witnesses containing inconsistencies which could be useful for cross-examination purposes if suppressed are unlikely to result in reversal of a conviction. If the defense attorney fails to request such statements by use of the Jencks Act, it has been held that the prosecution is not required to disclose them simply because they do contain such inconsistencies. The degree of materiality required appears to be much higher."

Judge Henry Friendly, writing for the Court of Appeals for the Second Circuit, in *United States v. Keogh*, 391 F. 2d 138 (1968), aptly summed up the question of materiality, at 147-148:

"[W]here the suppression was not deliberate . . . and no request was made, but where hindsight discloses that the defense could have put the evidence to not insignificant use . . . To invalidate convictions in such cases because a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict would create unbearable burdens and uncertainties."

Even if the evidence at issue in this case had had some definite impeachment value, and not merely arguable or speculative value, we would hold it not material enough to invoke the due process sanctions of *Brady v. Maryland*.

On the issue of suppression, the appellant fails not because a weak link in his chain of argument gave way, but because every link gave way.

*Evidence of the Full Interrogation*

On January 2, 1972, Detective DeMuth of the Baltimore County Police Department interviewed the appellant. The appellant does not now dispute the fact that he was given his full panoply of warnings under *Miranda.* Furthermore, he understood them. He signed a waiver form, fully acknowledging having been informed as to his rights and "knowingly and voluntarily" agreeing "to be questioned and/or make a statement."

The appellant then was asked a series of 24 questions, 16 of which he answered and 8 of which he "refused to answer." The refusals, moreover, were interspersed among the answers and were not all clustered at the end of the interrogation. The tone for the interrogation was set with the very first question and answer when the officer asked, "Are you willing to answer questions reference this armed robbery homicide? " and the appellant responded, "Some." The highly selective nature of the appellant's responses revealed a conscious design on his part to acknowledge participation in all preparatory steps for the crime and in a purely accessory role, but to deny direct participation as a principal in the first degree. The whole flavor of the question and answer session must be appreciated:

1. Q. Are you willing to answer questions reference this Armed Robbery Homicide?

   A. Some.

2. Q. I show you 2 mug shots, who are they?

   A. #73574 John McCormack — Gloucester, Mass.
   #73576 Adelbert Grondin — Hartford, Conn.

3. Q. Did you 3 pull this Armed Robbery?

   A. REFUSED TO ANSWER.

4. Q. Did you go in on the job at the liquor store?

   A. No.

5. Q. Who drove the car?

   A. I did.

6. Q. What kind of car?

A. Dark blue Cad. 2 door.

7. Q. Who's Cad.?

A. Stole it in Quincy, Mass. from in front of a tire store, 1st part of Dec.

8. Q. Where is this Cad. now?

A. I don't know.

9. Q. Where was it the last time you saw it?

A. We left it near a railroad underpass.

10. Q. What did you do to the car?

A. John set it on fire.

11. Q. Who's gun was used?

A. REFUSED TO ANSWER.

12. Q. Where is the gun now?

A. REFUSED TO ANSWER.

13. Q. Was there a girl with you?

A. Well Lorrie Scully left Hartford, Conn. with us but stayed at the New Motel in Balto.

14. Q. Do you want to talk about the Armed Robbery Homicide?

A. No.

15. Q. Have you ever seen Lt. Roemer & Det. DeMuth before?

A. Yes. At the Greyhound Bus Station in Balto. on Tuesday Dec. 28, 1971.

16. Q. Did the girl Lorrie know there was going to be a holdup?

A. No.

17. Q. Did anyone have a gun in the Cad.?

A. REFUSED TO ANSWER.

18. Q. Did you buy a gun in Hartford, Conn.?

A. No.

19. Q. Who went in the liquor store?

A. REFUSED TO ANSWER.

20. Q. Did you shoot anyone in a armed robbery?

A. No.

21. Q. Did John McCormack shoot anyone?

A. REFUSED TO ANSWER.

22. Q. Did Adelbert Grondin shoot anyone?

A. REFUSED TO ANSWER.

23. Q. How much money did you get out of the holdup?

A. REFUSED TO ANSWER.

24. Q. Walter do you want us to stop this interview?

A. Yes. I believe I should have an attorney.

Detective DeMuth was permitted, over the appellant's objection, to read the entire series of questions and answers to the jury. Ultimately, the written statement containing the entire series of questions and answers was entered into evidence and, upon a request from the jury, was taken into the jury room during final deliberations. The appellant now claims that his rights under the self-incrimination clause of the Fifth Amendment were violated when his non-responses to certain questions were revealed to the jury.

The context is highly unusual. Various statements by the Court of Appeals that statements are "properly admitted as a whole, containing both the incriminatory and the exculpatory parts," *Williams v. State*, 205 Md. 470, 473, 109 A. 2d 89; *Jefferson v. State*, 228 Md. 331, 334, 179 A. 2d 876,

are not really in point since they were not dealing with evidence of custodial questions to which silence was the response. Nor, on the other hand, do we find the cases cited by the appellant to be ultimately helpful. Every one of them deals with a situation where the defendant either declined to take the stand in his own defense at trial, and the State made comment thereupon, or where he remained totally silent in the face of a series of questions from the police. In the latter situations, particularly one such as in *People v. Rolston*, 187 N.W.2d 454 (Mich.), the court held it completely improper for the state to recite at trial a long series of questions going into every detail of the crime, whereto the defendant had remained absolutely mute from the beginning of the interrogation session to the end. Such derogations of the Fifth Amendment privilege obviously run afoul of both *Miranda v. Arizona*, 384 U. S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966), and *Griffin v. California*, 380 U. S. 609, 85 S. Ct. 1229, 14 L.Ed.2d 106 (1965).

We are writing essentially on a clean slate. At issue is no underhanded attempt by the State to offer via a policeman's questions that which they could not offer via a defendant's answers. The impact of the full context of all questions and answers is not so much to impute guilt to one who chose to stand upon his Fifth Amendment rights, but to make the responses that were given more intelligible. The question, "Did you shoot anyone in a armed robbery?" followed by the answer, "No," could, standing alone, indicate total ignorance of the entire criminal episode. Coupled, however, with the two following refusals to answer when the questions were, "Did John McCormack shoot anyone?" and "Did Adelbert Grondin shoot anyone?" it becomes rather a careful avoidance of principalship in the first degree rather than total ignorance of the crime. Similarly, the answer "No" to question 4, "Did you go in on the job at the liquor store? " becomes more of a careful and precise response, imputing guilty knowledge rather than an abject denial of all knowledge, when considered in conjunction with the refusal to answer question 19, "Who went in the liquor store? "

Moreover, a case of such unusual first impression should

prompt a re-examination of fundamental principles. What, after all, were *Miranda* and its progeny intended to avoid?: The "inherently coercive" circumstances of custodial interrogation which, with no neutral witness to perpetuate the scene, could frequently "overbear the will" of a frightened and isolated defendant. We simply do not see any threat of that sort at bar. The appellant here was a cagey and resourceful suspect who, for whatever his purposes, chose to walk a dangerous line, obviously trusting to his own quick wit and selective judgment to keep him out of harm's way. He chose to spar with the police. We do not see in the disclosure of that voluntary encounter, in its full and intelligible context, any violation of fundamental fairness so as to offend the due process clause of the Fourteenth Amendment.

We note additionally, however, that even if there had been error in submitting evidence of the full interrogation to the jury, we are persuaded that the error was harmless beyond a reasonable doubt. We feel this for two reasons. Firstly, the evidence of the appellant's guilt was overwhelming even without any admissions by him whatsoever. Secondly, those parts of the incriminating statement to which he takes no appellate umbrage were fully and effectively damning, so that any inferences that might conceivably have been drawn from his refusal to confess further were harmlessly cumulative. That violations of *Miranda v. Arizona* and *Griffin v. California* can be harmless error is no longer to be doubted. *Milton v. Wainwright*, 407 U. S. 371, 92 S. Ct. 2174, 33 L.Ed.2d 1 (1972); *Collins v. State*, 14 Md. App. 674, 679-680, 288 A. 2d 221. Cf. *Schneble v. Florida*, 405 U. S. 427, 92 S. Ct. 1056, 31 L.Ed.2d 340 (1972).

*Judgments affirmed.*