### WILLIAM HALL v. STATE.

No. A-4091.   Opinion Filed Aug. 14, 1923.
(217 Pac. 229.)

(Syllabus.)

1.   **Removal or Disposal of Mortgaged Property.**   As to the uses and abuses of prosecutions for removing or disposing of mortgaged property, see the text of the opinion.

2.   **Chattel Mortgages—Disposing of Property—Effect of Prior Termination of Original Obligation Secured.**   Where a chattel mortgage is given as a collateral contract to assure the performance of a prior original obligation, and where the original obligation by mutual consent or otherwise is ended, the collateral obligation also ceases, and thereafter will not support a prosecution for disposing of mortgaged property.

   Whether such were the facts here, or whether the original obligation was altered or modified at the time of the alleged disposal of the mortgaged property does not appear.

3.   **Prosecuting Attorney—Improper to Permit Persons to Use Penal Statute for Private Ends.**   A prosecuting attorney should not permit private persons to use a statute penalizing a person for disposing of mortgaged property as a means of making private collections, or to compel an individual to make a monetary settlement of a private claim, or failing to do so, suffer the odium and danger of a criminal prosecution. Such practice is especially repugnant to our conception of the proper use of criminal process, and is unethical when perpetrated by an interested private prosecutor, either with or without the consent of the prosecuting attorney.

Appeal from District Court, Texas County; Arthur G. Sutton, Judge.

William Hall was convicted of disposing of mortgaged property, and he appeals. Reversed.

John L. Gilson, for plaintiff in error.

The Attorney General and E. L. Fulton, Asst. Atty. Gen., for the State.

BESSEY, J. William Hall, plaintiff in error, here referred to as the defendant, was by information filed on the 30th day of November, 1920, charged with having on the 30th day of November and other dates anterior thereto, disposed of and removed mortgaged property. At the trial, on May 7, 1921, he was by a verdict of the jury found guilty. The jury failing to assess the penalty, the court in rendering judgment on the verdict assessed the punishment at two years in the penitentiary. From this judgment he appeals.

We are constrained to hold that this case should be reversed on general principles for several reasons, any one of which, standing alone, might not amount to reversible error, but which, considered together, make it apparent that this was a prosecution instituted and carried on by private individuals, handled by an interested private prosecutor, at the public expense of the county, for the purpose of effecting or forcing an adjustment of contractual claims between private individuals, and that the defendant did not have such a fair and impartial trial as is contemplated by law. After reciting the facts, the reasons for such a conclusion will be stated.

The testimony shows that on the 15th day of October, 1919, the defendant came to Texas county from near Alva, where he had been residing, and entered into negotiations with W. L. West for the purchase of 320 acres of land; that after prolonged negotiations and much changing of terms and conditions W. L. West and R. O. West sold him this land. In the course of time the defendant, with five sons and one daughter, took possession of the land so purchased.

It was provided in the original agreement that the defendant should procure a loan on this land of the amount of

$5,000, from the school land department, or elsewhere, and with the money so obtained make an initial payment, and should give notes and mortgages securing the deferred payments. It later developed that the defendant could not procure a loan for $5,000, but could and did obtain a loan for $3,500, which sum was passed to the credit of the grantors. That having been done, the defendant executed five notes for $650 each, amounting in the aggregate to $3,250; in addition, he executed five other notes of $1,850 each, totaling $12,500; the aggregate amount of the notes and mortgages being $16,000, the purchase price of the land. During the pendency of the negotiations, the notes, mortgages and deeds of conveyance were deposited in escrow.

At the time of these transactions there was a growing crop of maize on the land. It is claimed by the state that, in addition to the cash payment, notes, and mortgages given for the purchase price of the land, the defendant executed a collateral mortgage for $650, covering this crop of maize, the proceeds of which were to be applied upon one or another of the notes given for the purchase price of the land, as above stated. The defendant denies that he ever executed this collateral mortgage. The testimony on this point is in direct conflict; there being testimony to support the prosecution's claim and equally strong testimony refuting it.

The defendant admits that he sold the maize that was growing upon the land at the time he made the purchase, and that he appropriated the proceeds to his own use. There is evidence to the effect that he also gave a mortgage upon the crop grown upon this land the following year, and that there were suits, controversies, and foreclosure proceeding growing out of that transaction.

It appears that when these mortgages were given Earl Martin, an attorney at law of Hooker, Okla., was the attorney for the grantors; that he drew some or all of the contracts, mortgages, and notes in question, including the $650 mortgage purporting to be a collateral obligation upon which this prosecution is based. Mr. Martin was a witness to the signature to this collateral mortgage, or purported mortgage, and was one of the chief witnesses for the state in this prosecution. Notwithstanding that fact, the record discloses that he appeared in the trial court as a special prosecutor, and that he actively aided the prosecuting attorney in this prosecution.

It appears from the evidence, inferentially at least, that no further payments were ever made by the defendant upon the land, and that some time during the year 1920 the land reverted back to the grantors—just in what manner the record does not disclose.

The defendant denies executing the chattel mortgage here at issue. Upon that point the evidence is sharply conflicting. Excluding the testimony of the special prosecutor, who was also the attorney for the prosecuting witness in civil matters growing out of the same transactions, the testimony indicates that the defendant did not sign nor authorize the signature of this collateral chattel mortgage. Photographic copies of several admitted signatures of the defendant, considered with other testimony, indicate that this signature was in a different handwriting. This was corroborated by a handwriting expert. On the other hand, the special prosecutor testified that the defendant did sign this mortgage, and that he also signed it, along with Charles Crittenden, as witness. Crittenden would not say positively that the defendant was the person who signed as mortgagor. Maggie Hall, daughter of the defendant, who sometimes transacted business for her father, says she signed

her father's name to the instrument at her father's home, in his absence, at the request of Mr. Martin, the special prosecutor. Earl Hall, a son, testified that he was present when his sister signed her father's name to the instrument, and that she did so at the request of Mr. Martin, who stated to her that it was a paper they had overlooked when the father, William Hall, attached his signature to other papers the previous day. The state also introduced expert evidence tending to show that the signature to this mortgage was made by the defendant. Under such state of the evidence the jury found for the state upon this issue, and the conflict in the evidence, considered alone, would not justify this court in setting the verdict aside, but such irregularly obtained and unsatisfactory evidence may and should be taken into consideration in connection with other things disclosed by the record, viz.:

1. This was a chattel mortgage, collateral to a real estate transaction. Query: If the original or principal transaction fails through mutual mistake or by agreement of parties, then would not the collateral transaction fail with it? The evidence raises an inference that the original real estate deal some months later was abandoned or settled in some other manner, and that the land reverted to the grantors. If that be true, would not the collateral contracts depending upon it also fail and be insufficient to sustain a conviction for disposing of the property covered by such collateral contracts or mortgage?

2. The act making it a crime to dispose of mortgaged chattels is, when properly invoked, a salutary statute, intended to punish offenders who violate the spirit of its provisions; but a prosecuting attorney should not permit private individuals to use this penal statute as a means of making private collections or to compel the accused to make a monetary settlement of a private claim, or, failing to do so, suffer the odium and dan-

ger of a criminal prosecution. Such practice is especially repugnant to our conception of the proper use of criminal process, and is unethical when perpetrated by a private prosecutor, either with or without the consent of the prosecuting attorney. Weitz v. State, 24 Okla. Cr. 56, 215 Pac. 962.

3. The impropriety of an attorney who is employed by and professionally represents a private person as his attorney, in a transaction concerning property later directly involved in criminal prosecution in acting as a special prosecutor in that prosecution, is manifest. In Weeks on Attorneys at Law, § 282a, it is said:

"The prosecuting attorney is a sworn minister of justice whose duty it is to see that the innocent are protected as well as that the guilty are brought to punishment, and who must stand indifferent as between the accused and any private party."

We think no argument is necessary to demonstrate that a special prosecutor is a special assistant to the county attorney for the particular case in which he appears, with like duties and qualifications. 22 R. C. L. Prosecuting Attorneys, § 7.

In Steeley v. State, 17 Okla. Cr. 252, 187 Pac. 821, the court, quoting with approval from People v. Gerold, 265 Ill. 448, 107 N. E. 165, Ann. Cas. 1916A, 636, said:

"The rule has long been firmly established that an attorney cannot represent conflicting interests or undertake to discharge inconsistent duties. * * *

"This rule is a rigid one, designed not only to prevent the dishonest practitioner from fraudulent conduct, but as well to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties." 1 Thornton on Attorneys, § 174.

Again quoting from the Steeley Case:

"Such an officer (county attorney) is acting in a quasi judicial capacity, and he and those associated with him should represent public justice and stand indifferent as between the accused and any private interest.* * * The canons of ethics of the American Bar Association and various state associations in this country are in accord on this subject. * * * An attorney cannot be permitted to assist in the prosecution in a criminal case if by reason of his professional relations with the accused he has acquired a knowledge of facts upon which the prosecution is predicated or which are closely interwoven therewith."

Mr. Martin, through his professional relations had not only previously acquired knowledge of the facts and had a prior professional connection with the property involved in the prosecution, but also testified for the state, at length, concerning the disputed transactions in which he had been interested as a private attorney for the prosecuting witness, showing conclusively that he was not an impartial, quasi judicial officer in the prosecution as is contemplated by law. True, no objection was made at the trial to Mr. Martin's participation in the case as a special prosecutor, but the error we think is one that this court should consider, even though no objections were made.

All things considered, we conclude that the judgment of the trial court should be reversed, and it is so ordered.

MATSON, P. J., and DOYLE, J., concur.