PHILIPPE A. SINCLAIR AND SINWELLAN
CORPORATION v. STATE
OF MARYLAND

[Nos. 818 and 817, September Term, 1973.]

*Decided May 29, 1974.*

The causes were argued before MENCHINE, MOORE and LOWE, JJ.

*Paul H. Spiller*, with whom were *Daniel H. Bathon, Morton Richard Kimmel* and *Kimmel, Spiller & Bradley* on the brief, for appellants.

*George A. Eichhorn, III, Assistant Attorney General*, with whom were *Francis B. Burch, Attorney General*, and *Richard Cooper, State's Attorney for Kent County*, on the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

Two separate but similar appeals will be coalesced in this opinion although they were tried sixteen days apart. The appeals were argued together and some confusion resulted from the transposed identification printed on and in the briefs. The issues will therefore reflect our understanding of the arguments appropriate to the applicable cases. They will be discussed according to their chronology of trial date rather than their case numbers.

- No. 818 -

On October 9, 1973, Philippe A. Sinclair and the Sinwellan Corporation, of which Mr. Sinclair was President, were each convicted of violating Maryland Code, Art. 27, § 144, "Obtaining money, etc., by check or other negotiable instrument with intent to stop payment." They were convicted by a jury presided over by Judge James A. Wise in the Circuit Court for Kent County. Appellant Sinclair was sentenced to six months imprisonment, with three months

suspended upon making restitution. Appellant Corporation was fined One Thousand Dollars which fine was suspended.

At the close of their case, Appellants resubmitted a motion for judgment of acquittal. Upon denying the motion, the judge restated the reasons he had given in denying the motion at the close of the State's case: " . . . it [§ 144] says that the mere giving of a stop payment order shall be presumed evidence . . . in other words, that forces you to put on a [prima] facie case to rebut it . . . ." He added, "There is [a] presumption that there was an intent to stop payment. Whether you have successfully rebutted that presumption is dependent on whether the jury accepts the explanation offered by the defendant and his witnesses. That is purely a jury question." The judge then denied the motion for acquittal as to the remaining counts charging violations under Art. 27, § 144.

The mischief the statute seeks to remedy is the wrongful obtention of something of value with a negotiable instrument issued by one, who at the time of issuance, intends to stop payment. The punishment is reserved for those persons who have such premeditated criminal intent. Thus it must be proved that the intent to countermand did exist at the time of issuance of check.

Since the element of intent is a mental process peculiarly personal to the perpetrator, the statute permits certain acts which caused the instrument to be dishonored by the drawee, if proven, to raise a presumption that the ephemeral element of intent existed *ab initio*. While the language of § 144 is anything but a model of clarity, it is implicit that, within the aegis of the crime created by § 144, the dishonor or disregard of the instrument by the drawee must have as its cause a stop order or countermand before the presumption may be used against the maker. If the dishonor or disregard by drawee is the result of any other cause, no presumption arises that at the time of issuance the maker intended to stop or countermand payment.

The language of § 144 creating the presumption reads:

" . . . And upon the trial of any person accused of violation of this section, the fact that such person

without the consent of such other to stop or countermand the countermanded payment of such instrument, *or otherwise caused the drawee to disregard or dishonor* the same without returning or tendering the return of the thing so obtained shall be presumptive evidence of such intent to cheat and defraud." (Emphasis added.)

The general term, "or otherwise caused," which misled the trial judge, is limited by the preceding specific causes of dishonor, *i.e.,* "to stop or countermand." The rule of construction we apply here, the rule of *ejusdem generis*, is based upon the supposition that " . . . if the Legislature had intended the general words to be considered in an unrestricted sense, it would not have enumerated the particular things." *Smith v. Higinbothom,* 187 Md. 115, 130.

A review of the record reveals that, absent the presumption, there was no evidence of intent elicited sufficient to permit the matter to go to the jury. The record further indicates conclusively that the check described in the information was dishonored or disregarded for "uncollected funds." This fact was testified to by the assistant cashier of the drawee bank:

"We went to our records and looked his balance up, and looked at the holds that we have on the account, and the not collected funds in the account, marked uncollected funds, and the check was given back to him *for uncollected funds.* It was not accepted for payment." (Emphasis added.)

The cause of dishonor was also indicated by a small slip in the nature of a bank form stapled to the check showing that the check was "Returned unpaid for reason indicated: . . . 'uncollected funds.' " These items were introduced as an exhibit on behalf of the State.

The assistant cashier also testified that the drawee bank received a telephoned order to stop payment on the check on the same day it was returned for uncollected funds.[1]

---

1. By questioning the assistant cashier, Judge Wise clarified for the jury

Nevertheless his testimony clearly indicated that the cause of dishonor or disregard of the check by the drawee bank was not the stop order or countermand. As a consequence, the presumption was not available to relate the intent to countermand back to the initial issuance of the check, and, as noted above, without the presumption the evidence was not sufficient to permit the case to go to the jury.

A similar presumption of criminal intent, under the guise of "prima facie evidence," was available to the State under § 142 of Art. 27 which applies where a negotiable instrument is not paid upon presentation and the maker has obtained things of value by means of such negotiable instrument issued with intent to cheat or defraud. The State did not elect to charge the Appellant with this "bad check" crime in case No. 818; however, they did utilize § 142 two weeks later as to other checks.

### - No. 817 -

On October 15th, 1973, a jury of the Circuit Court for Kent County, presided over by the Honorable James A. Wise, returned a verdict of guilty against Philippe A. Sinclair and the Sinwellan Corporation for the violation of Art. 27, § 142 of the Md. Code "Obtaining money, etc., by bad check or by means of credit card, etc." Appellant Sinclair was sentenced to six months imprisonment, to be served consecutively to a six month sentence previously imposed. The Corporation was fined One Thousand Dollars which fine was suspended.

what was meant by the term "uncollected funds" as contrasted with the more familiar term of "insufficient funds."

> "Judge Wise: The return of a check for uncollected funds means that there has been placed on deposit sufficient to cover that check, but that they were placed on deposit for collection by you, and since they haven't cleared you are not going to pay them out until you get acknowledgements that the funds are good, is that right?
>
> A: They have been deposited, but not necessarily that they are sufficient. That's the reason. They have been placed on deposit, but the checks may not be good, so we are not —
>
> Judge Wise: I understand. If the checks are good that would mean there are sufficient funds there?
>
> A: Yes."

The Sinwellan Corporation of which, as we have previously indicated, Mr. Sinclair was President, leased a marina and resort known as "The Great Oak Lodge" situate in Kent County, Maryland. The complaining witness, John Diskau, was the owner of a TV repair business known as "T.V. Specialists." He was hired by Mr. Sinclair to install a public address system including speakers on the docks. He also repaired the televisions at Great Oak Lodge and sold Appellants three reconditioned sets. The bill for the work and the goods came to a total sum of $2,835.70, of which approximately $1800 had been paid. A check for the final payment in the amount of $1,052.20 drawn on the Peoples Bank of Elkton was given to Mr. Diskau on May 30, 1973. An assistant cashier of the Peoples Bank testified that the check was presented to his bank for payment by Mr. Diskau on June 5th and again on June 27th. Each time the bank returned it because of insufficient funds in the account of the Sinwellan Corporation. The assistant cashier further testified that on May 30th, the date the check was issued, the Corporation's account contained only $154.86. At the time it was first returned for insufficient funds the balance was $17.91; the second time it was returned for insufficient funds the account was overdrawn by $1.34.

The Appellants were each charged by information with the violation of Md. Code, Art. 27, § 140 and with violation of Md. Code, § 142. The jury returned a verdict as to both Appellants of not guilty of false pretenses (§ 140) and guilty of the issuance of a bad check (§ 142).

The first question raised by the Appellants was whether the evidence was "sufficient to support a finding of guilty under § 140 or § 142." Obviously the evidence was not sufficiently persuasive for the jury to find guilt under § 140 since their verdict was "not guilty." In light of that result we are at a loss to explain the relevance of Appellants'.question.

It is equally obvious from a review of the record that the evidence was insufficient to sustain a guilty verdict of fraudulently obtaining things of value by means of a bad check under § 142. The complaining witness, Mr. Diskau, testified that the work was completed and the material

supplied *before* the worthless check was executed and given to him by Mr. Sinclair.

> "Q: And then you took the check, and that was for the merchandise and labor you had done?
>
> A: Yes Sir. That was the final payment on all of the work we had done."

It is apparent that the goods and services could not have been supplied in reliance upon a check that was subsequently offered in final payment, after the services had been performed and the merchandise had been provided. Cf. *Levy v. State,* 225 Md. 201. "It is . . . essential to a conviction of this offense that the person who received the worthless check must have relied upon defendant's representations [by means of the check] and thereby was fraudulently induced to part with his money or property." *Kaufman v. State,* 199 Md. 35, 40. See also *Levy v. State, Supra,* 206. Mr. Diskau's testimony was that " . . . the job started in November of '72 . . ." and the work was completed "May 30th" of 1973. He was paid in three installments; the final payment being the dishonored check of May 30th, 1973, given upon completion and dishonored upon presentation. The services and material were obviously supplied upon the expectation of payment by Sinclair upon completion of the job, but certainly not in reliance upon the check which was not yet in existence. The check, therefore, could not have been the "means" of obtaining the goods and services, or the inducement for Mr. Diskau to part with them. *Cf.* 2 Wharton, *Criminal Law and Procedure,* § 600. The record contains no evidence that the complaining witness was induced to part with the goods and services " . . . by means of a check . . . ," and absent such evidence, was insufficient to support the conviction under § 142 of Art. 27.

> *In Case No. 818 the judgments are reversed; costs are to be paid by Kent County.*
>
> *In Case No. 817 the judgments are reversed; costs are to be paid by Kent County.*