# PHILIPPE ANDRE SINCLAIR *v.* STATE OF MARYLAND

[No. 591, September Term, 1974.]

*Decided June 26, 1975.*

208

The cause was argued before MORTON, DAVIDSON and LOWE, J.J.

Submitted on brief by *Paul H. Spiller, Morton Richard Kimmel, Fred S. London* and *Kimmel, Spiller & Bradley* for appellant.

*Bernard A. Raum, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Richard R. Cooper, State's Attorney for Kent County,* and *Basil Wadkovsky, Deputy State's Attorney for Kent County,* on the brief, for appellee.

MORTON, J., delivered the opinion of the Court. Davidson, J., dissents and filed a dissenting opinion at page 218 *infra*.

The appellant, Philippe Andre Sinclair, was convicted by a jury sitting in the Circuit Court for Caroline County (Wise, J., presiding) on five separate charges (contained in an information) of violating the so-called Worthless Check Act, Code, Art. 27 § 142. A sentence of five years, with three years suspended, was imposed on the first conviction (count 3 of the information) and identical concurrent sentences were imposed on the remaining four convictions (counts 7, 11, 15 and 19 of the information). The case had been removed from the Circuit Court for Kent County.

In this appeal appellant raises a number of issues, in the first of which he contends that the evidence was legally insufficient to support a finding of guilt under Code, Art. 27 § 142.

It appears from the record that the appellant was president of Sinwellan Corporation which operated a resort known as The Great Oak Lodge near Chestertown in Kent County, Maryland. On five separate occasions between

July 13, 1973, and August 31, 1973, checks signed by the appellant, drawn on several banks in varying amounts totaling over $10,000, made payable to Fulton Meat Packing Company (Fulton), were delivered to that company in payment for meats sold and delivered to The Great Oak Lodge. Each of the five checks was presented to the appropriate bank by Fulton and each was returned with the notation "Insufficient Funds" and the further notation on several of the checks, "Check presented twice, please do not present again." There was evidence that at the time of the trial below the checks still had not been honored or payment made to Fulton in lieu of the checks.

In contending that the evidence was legally insufficient to sustain the convictions, it is particularly contended that there was no evidence to show that appellant intended to cheat and defraud Fulton or that he signed the dishonored checks; that there was no "evidence that proved insufficient funds"; and that there was a failure to prove delivery of the meats.

Code, Art. 27 § 142, provides in part:

> "Every person who, with intent to cheat and defraud another, shall obtain money, credit, goods * * * or anything of value * * * by means of a check, draft or any other negotiable instrument of any kind drawn, whether by such person or by any other person, persons, firm or corporation, upon any bank * * * and the same be not paid upon presentation, shall be deemed to have obtained such money, credit, goods, services * * * or things of value by means of a false pretense. * * * The giving of the aforesaid worthless check, draft or negotiable instrument * * * shall be prima facie evidence of intent to cheat or defraud; provided that if such person shall be a bona fide resident of the State of Maryland and shall deposit with the drawee of such paper * * * within ten days thereafter funds sufficient to meet the same, with all costs and interest which may have accrued he shall not be prosecuted under this section, and no prosecution

either by presentment, indictment or otherwise, shall be instituted or commenced until after the expiration of said period of ten days."

We cannot quarrel with appellant's statement that under the statute, the "State must show that there was a representation of an existing fact made with intent to defraud, and that the operation of such representation as a deception induced a transfer and the obtaining of the money or property by the person committing the fraud to the loss of another." *See League v. State,* 1 Md. App. 681. We cannot agree, however, that the State failed to meet its burden.

The credit manager of Fulton (whose principal place of business was in Massachusetts) testified that Fulton agreed to deliver meats to The Great Oak Lodge upon order of the chef and that the shipments were to be made by common carrier (motor freight) on a C.O.D. basis. The driver of the truck was specifically instructed not to deliver the meats until he had received payment, either by check or in cash. He further testified that each of the five checks was given to Fulton for meats "sold and delivered" to The Great Oak Lodge. According to the manager, on several occasions when the checks were returned unpaid, he talked with appellant who advised him "redeposit them and they are all right."

We think it perfectly clear, therefore, that Fulton was induced to part with its property in reliance upon the representation of appellant (which turned out to be a misrepresentation) that the checks were good. The statute provides that the giving of a worthless check "shall be prima facie evidence of intent to cheat or defraud." The appellant not only failed to rebut the presumption by "making good" the checks within the ten days provided for in the statute, but the record indicates that the checks were still unpaid at the time of the trial below. Thus, rather than rebutting the statutory presumption, the appellant's course of action would appear to have confirmed his intention to cheat and defraud.

We find no merit in the contention that there was no proof of the delivery of the meats. There was the evidence that the

truck driver was not to make delivery until he had received a check in payment therefor and Fulton had five checks in its possession which the manager stated ostensibly represented payment for the delivered meats. There was testimony from eyewitnesses to the delivery of the meats on several occasions. Finally, there was the testimony of the appellant himself who told the credit manager of Fulton to "redeposit the checks," a statement he would hardly have made in the absence of the delivery of the meats.

With respect to proof of appellant's signature, it is highly unlikely that appellant would advise the credit manager to redeposit the checks — "they are all right" — if they had not contained his signature as the drawer. Moreover, the jury had before it for comparison the checks themselves and the bank's signature cards. The issue of whether the checks were drawn by the appellant was for the jury and the members obviously concluded that it was his signature.

The contention that there was no evidence to prove insufficient funds to pay the checks is patently frivolous. The evidence was overwhelming that they had not been paid. Thus, we find no merit in the appellant's contention that the evidence was legally insufficient to support a finding of guilt under Code, Art. 27 § 142.

The appellant mounts a vigorous attack upon the validity of his convictions because "the State's Attorney had a conflict of interest but prosecuted nevertheless * * *."

It appears that on January 24, 1974, the state's attorney wrote the following letter to the Governor of Maryland:

"Dear Sir:

Kent County is involved in the prosecution of one Philippe Andre Sinclair and the Sinwellan Corporation, both of whom were indicted on October 30, 1973, in Kent County. The charges arose out of a transfer of Great Oak Lodge and Yacht Club.

Certain events have transpired which have rendered me incapable of handling the prosecution.

These events have been discussed with Clarence W. Sharp, Chief of the Criminal Division of the Attorney General's Office.

I, therefore, hereby request that the Attorney General's Office handle the prosecution of these cases.

Thank you very much for your kind cooperation and consideration in this matter." [1]

At a pretrial conference held on April 4, 1974, appellant discovered that, notwithstanding the State's previous motion to continue the case in order to permit its prosecution by an assistant attorney general, rather than by the state's attorney, the state's attorney himself was going to prosecute the case. On April 11, 1974, appellant filed a motion seeking, among other things, to disqualify the state's attorney and the deputy state's attorney from prosecuting the cases and to dismiss the cases because of a conflict of interest on the part of those officials. Attached to the motion was a sworn affidavit of appellant, dated April 11, 1974, which read in pertinent part as follows:

"(1) That the State's Attorney, Richard Cooper, and the Deputy State's Attorney, Basil Wadkovsky, hold themselves out as a partnership in the practice of law in Chestertown, Maryland;

(2) That Basil Wadkovsky is or has acted as attorney for the Maryland National Bank and such Bank holds a note against Frank and Ethel Russell and Great Oak Estates Realty, Inc.;

(3) That State's Attorney Cooper is or has been

---

1. In his brief appellant appended, as Exhibit "A," the letter dated January 24, 1974 from the state's attorney to the Governor, the text of which was set forth above. This document was placed in the record by the state's attorney as an attachment to a motion for continuance. Appellant also appended, as Exhibit "B," a document dated May 20, 1974, from the state's attorney to appellant's attorney. This document, written after the trial ended, does not appear in the record in the case.

In its brief the State made a motion *ne recipiatur* and a motion to strike Exhibits "A" and "B" from appellant's brief. The motion is denied with respect to Exhibit "A," which the State itself made a part of the record in this case. It is granted with respect to Exhibit "B."

attorney for Carrol Tilley who holds a note against the Russells and Great Oaks Resort & Yacht Club, Inc.;

(4) That the defendant, Philippe A. Sinclair during 1972 and 1973 was involved and negotiating with the purchase of Great Oak Resort & Yacht Club, Inc., and Great Oak Estates Realty, Inc., and the lands of Frank and Ethel Russell;

(5) That State's Attorney Cooper and Deputy State's Attorney Wadkovsky attempted to sell the notes they held to the defendant Philippe A. Sinclair in July and August of 1973. The matter was not consummated and thereafter in October of 1973, State's Attorney Cooper made presentment to the Grand Jury of Kent County and issued informations which are the subject matter of the present criminal actions; and the Grand Jury returned indictments;

(6) That State's Attorney Cooper in October of 1973 prior to any presentment to the Grand Jury, informed the defendant Philippe A. Sinclair that if defendant filed an appeal in the civil action entitled Great Oak Resort & Yacht Club, Inc., et al. v. Sinclair, et al., that he, State's Attorney Cooper, would indict the defendant;

(7) The appeal was taken on October 29, 1973;

(8) The Grand Jury was called into special session on the day following the appeal of the civil action and indictments were returned;

(9) Previous to the appeal being filed on behalf of defendant Sinclair, the Grand Jury had been given presentments but had not returned any indictments."

A copy of the letter to the Governor of Maryland, dated January 24, 1974, from the state's attorney, set forth above, was attached to the affidavit.

On April 17, 1974, Judge Wise, considering the motion to dismiss as one to grant appropriate relief before trial

under Maryland Rule 725, entered an order, without a hearing, denying the motion. In the text preceding his order, Judge Wise stated, in part:

> "The grounds for relief consist mostly of bald allegations. While it would appear therefrom that the State's Attorney and/or his Deputy may have had or evinced an adverse or even antagonistic interest, there is nothing alleged or inferable that would indicate any conflict of interest or other posture which would in any way unduly prejudice the defendant. The indictments represent action of the Grand Jury, rather than that of the prosecutor,[2] and any improper motivation of the State's Attorney in filing presentments should be pursued civilly or tactically. In any adversary proceeding the opposing counsel must of necessity be hostile, and in the case of a prosecutor he could not perform competently otherwise, yet that does not necessarily indicate ground for disqualification. Such seems to be the situation here."

The office of the state's attorney is constitutionally created: "There shall be an attorney for the State in each county, and the City of Baltimore, to be styled The State's Attorney, who shall be elected by the voters thereof * * *." Constitution of Maryland, Art. V, § 7. The state's attorney is an official of the executive branch, *Powell v. State*, 16 Md. App. 685, 694-95, n. 1, and serves as a state rather than a local officer, *Valle v. Pressman*, 229 Md. 591, 600. "The State's Attorney shall perform such duties * * * as shall be prescribed by law * * *." Constitution of Maryland, Art. V, § 9. In implementation of these constitutional provisions, Code, Art. 10 § 34 provides: "The State's Attorney for each county and the City of Baltimore shall, in such county or city, prosecute and defend, on the part of the State, all cases in which the State may be interested." The office of state's attorney, being unknown to the common law, is possessed of

---

2. The judgments of conviction which are the subject of this appeal were based on charges contained in an information. Maryland Rule 708.

no other powers than those prescribed by the Constitution and statutes of the State, *Kilgour v. Evening Star Newspaper Co.*, 96 Md. 16, 29; *Hawkins v. State*, 81 Md. 306, 310; but these powers are nowhere enunciated and defined. *Wells v. Price*, 183 Md. 443, 446; *State v. Aquilla*, 18 Md. App. 487, 493, *cert. denied*, 269 Md. 755. The responsibility for prosecuting criminal cases at the trial level devolves upon the state's attorney by reason of his constitutional mandate as implemented by statute. *Aquilla, supra*, at 493; *State v. Hunter*, 10 Md. App. 300, 305-06 n. 5, *writ of certiorari dismissed as having been improvidently granted*, 263 Md. 17. In addition to the state's attorney's routine duties as a prosecutor, he has certain obligations to the public and to the criminal court. "He not only represents the State in the realm of law enforcement, but is also in a very special sense as officer of the court * * * so that * * * he has, impliedly, both the right and the duty to help give effect to the law and the judgments under it as pronounced by the Court." *Wells, supra*, at 449.

The state's attorney is vested "with broad official discretion to institute and prosecute criminal causes." *Brack v. Wells*, 184 Md. 86, 90; *Aquilla, supra*, at 494; *Hunter, supra*, at 305-06 n. 5. In *Brack, supra*, at 90, the Court of Appeals said:

> "In such prosecutions of persons accused of crime, he must exercise a sound discretion to distinguish between the guilty and the innocent. He must be trusted with broad official discretion to institute and prosecute criminal causes, subject generally to judicial control. The office is one not purely ministerial, but involves the exercise of learning and discretion. 42 *American Jurisprudence*, p. 245. As a general rule, whether the State's Attorney does or does not institute a particular prosecution is a matter which rests in his discretion."

It is at once apparent, therefore, that a state's attorney is an elected public official; holding a constitutional office; and a member of the executive branch of government. He can

only be removed from office "for incompetency, wilful neglect of duty, or misdemeancr in office, on conviction in a Court of Law, or by a vote of two thirds of the Senate, on the recommendation of the Attorney General" (Constitution of Maryland, Art. V § 7); and he is entrusted "with broad official discretion to institute and prosecute criminal charges" *(Brack, supra,* at 90).

That a state's attorney should perform the duties of his office in a fair, impartial and objective manner is to state the obvious. (*See* American Bar Association Fair Standards of Criminal Justice.) The words fair, impartial and objective — words readily understood generally — are somewhat difficult, on occasion, to define in terms of specific acts and conduct. All individuals, including state's attorneys, are subject to degrees of emotion, prejudice, taste and innate predilection. Thus, it is always possible that the course of conduct of a state's attorney, as any other public official or private citizen, may be motivated by worthy or unworthy ideals. In appraising the conduct of a state's attorney who is charged, as here, with having a conflict of interest of such proportions as to disqualify him from prosecuting a particular individual, we think the true measure or standard by which his conduct should be viewed is posed in the simple issue: Did his action in prosecuting the individual result in a denial of due process of law to that individual. Otherwise stated, was the prosecution of the accused so wanton, blatant and harassing as to deny the accused his fundamental right to a fair and impartial trial. In our view, therefore, the hard core issue is whether the bringing of the prosecution resulted in the accused being denied his fundamental and constitutional right to the due process of law as that right is known to us in modern society.

Thus, the issue before us cannot be disposed of by a simple finding that the state's attorney for Kent County had a conflict of interest insofar as the appellant is concerned, and we make no judgment on the finding of the trial judge in this respect. We look to the broader issue of due process and, measured by that standard, we cannot find a shred of evidence in the record before us to indicate in any way that

the appellant was denied his right to a fair and impartial trial. That the appellant's prosecution may have resulted from reprehensible conduct by the state's attorney or may have been motivated by ill will or personal prejudice toward the appellant on the part of the state's attorney, does not alter the simple, crystal-clear fact that on the record before us the convictions suffered by the appellant were the result of his being accorded a fair trial by an impartial judge and jury. Under these circumstances, we find no merit in the contention that the appellant's convictions should be reversed because "the State's Attorney had a conflict of interest but prosecuted nevertheless * * *." [3]

The appellant next contends that "The Court's prejudicial remarks during the trial coupled with error in the instructions to the jury necessitates reversal of the conviction[s]." He also asserts that "The trial court aided the prosecution * * *." We have carefully scrutinized the record and find no substance to these contentions. It is the responsibility of a trial judge to insure that the trial of an accused proceeds in a fair, orderly and expeditious manner. *See Douglas v. State*, 9 Md. App. 647, 655. Judge Wise did just this and we see no prejudice to the rights of the appellant in the conduct of the trial. A review of the instructions to the jury demonstrates that they contained a clear and correct statement of the law of the case. We find no error.

Finally, appellant asserts that he "attempted to demonstrate that $20,000.00 was on deposit with the Maryland Title and Guaranty Company and that [he] would have used these funds [to make good] * * * the five checks, but for the fact that he was under Court order not to use them." We agree with the trial judge that such evidence was entirely irrelevant and we find no error in its exclusion.

*Judgments affirmed; costs to be paid by appellant.*

---

3. We have reviewed the cases from other jurisdictions cited by appellant and find them to be unpersuasive or inapposite.

218

*Davidson, J., dissenting:*

This is a sequel to *Sinclair v. State*,[1] which depicts the persistent efforts of a State's Attorney to protect the citizens of Kent County from criminal activity. These cases concern the activities of Philippe Andre Sinclair, the appellant (Sinclair), who, as president of the Sinwellan Corporation, leased and operated a marina and resort known as "The Great Oak Lodge" situate near Chestertown in Kent County, Maryland.

The initial case arose when Sinclair became unable to pay the salary of one of his employees and for goods and services rendered the Great Oak Lodge by a television repair business. On 9 October 1973 in the Circuit Court for Kent County, a jury, presided over by Judge James A. Wise, convicted Sinclair and the Sinwellan Corporation of violating Maryland Code (1957, 1971 Repl. Vol.) Art. 27, § 144, "Obtaining money . . . by check or other negotiable instrument with intent to stop payment." Accordingly, Sinclair was sentenced to six months imprisonment with three months of the sentence to be suspended upon a making of restitution. The corporation was fined $1,000 which fine was suspended. On 15 October 1973 in the Circuit Court for Kent County, a jury, with Judge Wise again presiding, convicted Sinclair and the Sinwellan Corporation of violating Art. 27, § 142, "Obtaining money . . . by bad check." Sinclair was sentenced to a consecutive six month term of imprisonment. The corporation was again fined $1,000 which fine was suspended. The case concluded when both of the judgments were reversed. *Sinclair and Sinwellan Corporation, supra.*

This case arose when Sinclair became unable to pay for some meat used in the lodge's restaurant. On 9 November 1973 in the Circuit Court for Kent County, Richard R. Cooper, State's Attorney for Kent County (Cooper), filed a 20 count information charging both Sinclair and the Sinwellan Corporation with violations on five separate

---

1. State v. Sinclair and Sinwellan Corp., 274 Md. 646, 337 A. 2d 703 *aff'g,* 21 Md. App. 477, 319 A. 2d 549 (1974).

occasions of Art. 27, § 140, "Obtaining money . . . under false pretenses," and Art. 27, § 142. On 22 January 1974 Judge George B. Rasin, Jr., granted a motion for removal, filed by Cooper, and removed the case for trial to Caroline County.

On 25 January 1974 Basil Wadkovsky, Deputy State's Attorney for Kent County (Wadkovsky), filed a motion for a continuance based upon, among other things, the fact:

"3. That the Defendant has made certain allegations concerning the State's Attorney which has required the State's Attorney to request the Governor of the State of Maryland to appoint the Attorney General to prosecute these cases. That the Assistant Attorney General who has been tentatively assigned to handle the prosecution for the State is in trial in another county and will not be available to prosecute these cases for at least two (2) months. Attached please find a copy of my [sic] letter to Governor Mandel."

The attached letter, from Richard R. Cooper, State's Attorney, to the Honorable Marvin Mandel, Governor, dated 24 January 1974, indicated that "certain events" had transpired which had rendered Cooper "incapable of handling the prosecution" and requested that "the Attorney General's office handle the prosecution of these cases." [2]

Sinclair's discovery at a pretrial conference on 4 April 1974, that Cooper himself was going to prosecute the cases [3]

---

2. Article V, § 3 of the Maryland Constitution provides that "when required by the Governor or General Assembly, he [the Attorney General] shall aid any State's Attorney in prosecuting any suit or action brought by the State in any Court of this State, and he shall commence and prosecute or defend any suit or action in any of said Courts, on the part of the State, which the General Assembly, or the Governor, acting according to law, shall direct to be commenced, prosecuted or defended. . . ."

3. Maryland Code (1974), *Courts and Judicial Proceedings Article*, § 2-102 (a) [formerly codified as Code (1957, 1973 Repl. Vol.) Art. 26, § 11] states as follows:

"If advisable in a specific proceeding, a court may appoint an auditor, surveyor, court reporter, assistant counsel for the state, counsel for a party if authorized by law or rule, accountant,

was followed on 11 April 1974 by Sinclair's motion seeking, among other things, to disqualify State's Attorney Cooper and Deputy State's Attorney Wadkovsky from prosecuting the cases, and to dismiss the cases because of a conflict of interest on the part of those officials. Attached to the motion was Sinclair's sworn affidavit in which he stated that indictments and informations against him were issued and filed only after he refused to purchase certain notes representing the indebtedness of the owners of the Yacht Club to Cooper's and Wadkovsky's private clients, and after he ignored Cooper's and Wadkovsky's threats of criminal prosecution in the event that he filed an appeal from a civil judgment against him and in favor of the owners of the Yacht Club. A copy of the letter dated 24 January 1974, from Cooper, was also attached. On 17 April 1974, Judge Wise, without a hearing, denied the motion.

According to the docket entries on 22 April 1974 the State's motion to *nol pros* all counts except numbers three, seven, eleven, fifteen and nineteen of the information, was granted. A jury trial then proceeded on that date solely on those five counts, each of which involved a charge against Sinclair for a violation of Art. 27, § 142 on five distinct occasions. At the conclusion of the trial the jury found Sinclair guilty of all five counts. Cooper, indicating that he hoped "the Court doesn't consider this as being in any [way] vindictive, as I have been accused," then asked that the pretrial bond of $95,500.00 be discontinued. Judge Wise continued bail and released Sinclair, remarking that "$95,000.00 is ample for about any offense" and that there had been no previous problem with Sinclair's appearances for trial. On 4 June 1974 Judge Wise sentenced Sinclair, on each of the five counts, to a term of five years imprisonment, three years of which were to be suspended, with all of the sentences to run concurrently. Other criminal charges pending against Sinclair remained to be tried.

---

master, examiner, or other officer, and may require his presence in court."

Cooper did not ask the court to appoint a special prosecutor.

On appeal Sinclair raises eight grounds for reversal. I agree with the majority that seven of Sinclair's contentions are without merit. Unlike my colleagues, however, I believe that there was evidence presented which, if believed, would create the appearance of a conflict of interest on the part of Cooper and Wadkovsky and that such circumstances would necessitate reversal and remand for further proceedings.

The majority recognizes that the State's Attorney is vested with broad official discretion to institute and prosecute criminal causes but, despite its quotation from *Brack v. Wells*, 184 Md. 86, 90, 40 A. 2d 319, 321 (1944), makes no mention of the fact that the exercise of that discretion is subject to judicial control. A quotation from *Brack, supra,* fuller than that provided by the majority, states as follows:

"By the Constitution of Maryland, Article 5, Section 9, the State's Attorney shall perform such duties as may by law be prescribed. By Section 33 of Article 10 of the Code, 1939, that officer is required to 'prosecute and defend, on the part of the State, all cases in which the State may be interested.' In such prosecutions of persons accused of crime, he must exercise a sound discretion to distinguish between the guilty and the innocent. He must be trusted with broad official discretion to institute and prosecute criminal causes, *subject generally to judicial control.* The office is one not purely ministerial, but involves the exercise of learning and discretion. 42 *American Jurisprudence,* p. 245. As a general rule, whether the State's Attorney does or does not institute a particular prosecution is a matter which rests in his discretion. *Unless that discretion is grossly abused or such duty compelled by statute or there is a clear showing that such duty exists, mandamus will not lie.* 38 *Corpus Juris,* p. 623; Boyne v. Ryan, 100 Cal. 265, 34 P. 707; *McLaughlin v. Burroughs,* 90 Mich. 311, 51 N. W. 283; *State v. Talty,* 166 Mo. 529, 66 S. W. 361. There is no allegation in the petition in this

case that such discretion was grossly abused, nor do the facts as set out constitute gross abuse of discretion. The statement that he acted arbitrarily and capriciously is a conclusion of the pleader." (Emphasis added.)

I am persuaded that the facts set out here if believed, would constitute a gross abuse of the State's Attorney's discretion to institute a criminal prosecution. I further believe that this Court has the power and obligation to remedy such an abuse.

The standards by which to appraise the conduct of a State's Attorney are established by Maryland law.[4] It is the duty of the prosecutor, as of every lawyer, to represent a client zealously within the bounds of the law. ABA, Code, Canon 7, Ethical Consideration 7-1. Because the power of the prosecutor to institute criminal prosecutions vests in him an authority in the administration of criminal justice at least as sweeping as, and perhaps greater than, the authority of the judge who presides in criminal cases, *American Bar Association, Standards Relating to the Administration of Criminal Justice*, The Prosecution Function, Introduction, at 77 (Compilation, 1974) [hereinafter referred to as *ABA, Standards*], the responsibility of a public prosecutor differs from that of the usual advocate. His duty is to seek justice, not merely to convict. *Powell v. State*, 16 Md. App. 684, 694-95 n. 1, 299 A. 2d 454, 459 n. 1 (1973); ABA, Code, Ethical Consideration 7-13; *see ABA, Standards*, The Prosecution Function, § 1.1 (c) at 83. His obligation is to protect not only the public interest but the innocent as well and to safeguard the rights guaranteed to all persons,

---

4. The standards relied upon appear in the Code of Professional Responsibility of the American Bar Association [hereinafter referred to as ABA, Code]. On 13 October 1970 the Court of Appeals, by Maryland Rule 1230, adopted the ABA Code thereby imbuing it with the force of law. Maryland Constitution, Art. IV, § 18, 18A. The ABA Code, contained in Appendix F to the Maryland Rules of Procedure, Vol. 9B of the Maryland Code (1957, 1971 Repl. Vol.) consists of three inter-related parts: the Canons which are axiomatic norms; the Ethical Considerations which are objectives toward which the legal profession should strive; and the Disciplinary Rules which establish the minimum acceptable level of professional conduct. *See* Crest Investment Trust, Inc. v. Comstock, 23 Md. App. 280, 301 n. 10, 327 A. 2d 891, 904 n. 10 (1974).

including those who may be guilty. *Brack, supra,* at 184 Md. 90, 40 A. 2d 321; ABA, Code, Ethical Consideration 7-13; *see ABA, Standards,* The Prosecution Function, Introduction at 77. As the Supreme Court stated in *Brady v. Maryland,* 373 U. S. 85, 87, 83 S. Ct. 1194,1197 (1963):

> "Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when an accused is treated unfairly."

Because a prosecutor represents the State, he must, as must a judge, not only be disinterested and impartial in the performance of his duties but also appear to be so.[5] *People v.*

---

**5.** While there is no direct authority in Maryland for the statement that a prosecutor must be disinterested and impartial in the discharge of his prosecutorial duties, the authorities cited in the text clearly illustrate that such a principle is one fundamental to our criminal justice system. Indeed, the majority opinion states that this rule of impartiality is an obvious one.

It is worthy of note that pursuant to Maryland Code (1957, 1971 Repl. Vol.) Art. 41, § 14A, Governor Marvin Mandel issued, by executive order, dated 4 September 1969, a Code of Ethics concerning possible conflict of interests, for all officers and employees of the executive branch of state government. Maryland Code (Vol. 9A, 1974 Cum. Supp.) Executive Orders, p. 130. Article I, Declaration of Policy provides that:

> "State officers and employees are responsible to all of the people of the State and not to any favored segment or group. The business and affairs of the State must be conducted in such an impartial manner that all persons understand that no State officer or employee can be improperly influenced. State officers and employees must avoid all situations where prejudice, bias, or opportunity for personal gain could influence their decisions. They must equally avoid circumstances suggesting that favoritism or personal gain is a motivating force in the conduct of State Government.
>
> "It is the intent of this Code to set forth the minimum ethical standards to be followed by officers and employees of the executive branch of the government. These standards are intended not only to require officers and employees to avoid activities that might result in using a public office or employment for private gain or the giving of favored treatment to any organization or person but also to maintain public confidence in the executive branch by prohibiting activities that might permit opportunity for personal gain or personal preference to influence decisions. The objectives are to maintain an impartial administration of the State government and to maintain public confidence in government."

Whether this Code actually governs the conduct of State's Attorneys, who, although members of the executive branch and officials of the State rather than local jurisdictions, are constitutionally established officers, has not been decided in Maryland.

*Krstovich,* 338 N.Y.S.2d 132, 137 (N.Y.Cty.Ct. 1972); *State v. Huson,* 440 P. 2d 192, 195 (Wash. App. 1968); *State v. McIntosh,* 333 S.W.2d 51, 58 (Mo.App. 1960); *People v. Lombard,* 168 N.Y.S.2d 419, 424 (N.Y. App.Div. 1957); *State v. Tate,* 171 So. 108, 112 (La. 1936); *Hall v. State,* 217 P. 229, 231 (Okla.Crim.App. 1923); ABA, Code, Canon 9; Canons and Rules of Judicial Ethics, Canons IV, XIII, XXIII, XXVIII, XXXII, XXXIII, Rule 2 (adopted by Maryland Rule 1231); *ABA, Standards,* The Prosecution Function, § 1.2, at 84; 42 Am. Jur., *Prosecuting Attorneys,* § 20, at 255-56 (1942); 23A C.J.S., *Criminal Law,* § 1081 (1961); 27 C.J.S., *District and Prosecuting Attorneys,* § 14 (1), at 674 (1959). In order to assure fair and equal treatment to all, a prosecutor must use restraint in the discretionary exercise of governmental powers, such as in the selection of cases to prosecute. ABA, Code, Ethical Consideration 7-13; *see ABA, Standards,* The Prosecution Function, § 1.1 (c), at 83; Comment, *Prosecutorial Discretion — A Re-evaluation of the Prosecutor's Unbridled Discretion and its Potential for Abuse,* 21 *DePaul L. Rev.* 485 (1971). *See generally* Uvilier, *Commentary, The Virtuous Prosecutor in Quest of an Ethical Standard: Guidance from the ABA,* 71 *Mich.L.Rev.* 1145 (1973); Freedman, *The Professional Responsibility of the Prosecuting Attorney,* 55 *G.L.J.* 1030 (1967). He, like a government attorney who possesses discretionary powers relative to civil litigation, should not use his position, or the economic power of the government, to harass parties or to bring about unjust settlements or results. *See* ABA, Code, Ethical Consideration 7-14. Finally, like all lawyers, he is forbidden to present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter. ABA, Code, Disciplinary Rule 7-105; *see State v. Detroit Motors,* 163 A. 2d 227, 230-31 (N.J. Super. 1960).

Here the record shows that there was sworn and uncontradicted testimony to the effect that in the years 1972 and 1973 Sinclair was negotiating to buy the Great Oak Resort and Yacht Club, Inc., Great Oak Estates Realty, Inc., and the lands of Frank and Ethel Russell. In July and August of 1973, State's Attorney Cooper and Deputy State's

Attorney Wadkovsky, who were then partners in the private practice of law, and who represented clients who held notes against the Great Oak Resort and Yacht Club, Inc., Great Oak Estates Realty, Inc., and Frank and Ethel Russell, attempted to sell Sinclair the notes held by their clients. The matter was never consummated. Moreover, there was sworn, uncontradicted testimony to show that in October, 1973, Cooper informed Sinclair that if he filed an appeal in a civil action entitled Great Oak Resort and Yacht Club, Inc., et al., v. Sinclair, et al., that he, State's Attorney Cooper, would indict Sinclair. Thereafter, in October, presentments were made to the grand jury. On 29 October 1973 the appeal in the civil suit was noted by Sinclair. On the following day, 30 October 1973, the grand jury was called into special session and returned several indictments against Sinclair. On 9 November 1973, according to the docket entries, State's Attorney Cooper filed the 20 count information charging the violations here involved.

On 24 January 1974, Cooper attempted to disqualify himself by requesting in a letter to the Governor the appointment of the Attorney General to prosecute the Sinclair-Sinwellan cases, indicating in the letter that "certain events" had transpired which rendered him incapable of handling those prosecutions. The nature of the events was clarified in a motion for continuance, filed the next day, which explained that "certain allegations" made by Sinclair concerning the State's Attorney had "required" him to request the Attorney General's appointment as prosecutor. The motion pointed out that an assistant Attorney General had been tentatively assigned, but that he would not be available for at least two months, and that the continuance was necessitated by the State's Attorney's disqualification. On 4 April 1974, according to a motion for disqualification filed by Sinclair, notwithstanding the apparent fact that trial had been postponed until 22 April 1974 in order to permit Cooper's replacement by an Assistant Attorney General, Sinclair learned that Cooper was himself going to prosecute. On 11 April 1974 Sinclair filed the motion for disqualification and dismissal which, as

we have said, Judge Wise denied on 17 April 1974. On 22 April 1974 the State's Attorney *nol prossed* 15 of the 20 counts in the information, and the case proceeded to trial on the five remaining counts. After the jury's verdict of guilty, Judge Wise denied Cooper's motion to discontinue Sinclair's $95,500.00 bail bond. Other outstanding criminal charges against Sinclair remained to be tried.

I think that, if believed, the evidence relating to the pattern of conduct engaged in by the State's Attorney and his assistant, viewed as a whole, and in particular the evidence that Cooper twice attempted to make arrangements with Sinclair for the benefit of his private clients, that he once threatened Sinclair with criminal prosecution in the event that Sinclair appealed an adverse civil judgment obtained by parties indebted to his private clients, and that, in fact, Cooper attempted to disqualify himself because of Sinclair's "allegations" of his misconduct, at least would give the appearance that Cooper threatened to and did, in fact, present criminal charges for the purpose of obtaining the advantage of protecting his private clients' interests by securing repayment on their outstanding notes. The evidence, if believed, also would give the appearance that Cooper's determination to charge and prosecute Sinclair was motivated in part by the hope that successive prosecutions and convictions would cause Sinclair to capitulate and cooperate with Cooper, either by purchasing the notes of his clients or by not filing an appeal in the civil litigation involved, thus making it appear that Cooper used his position and the power of the government to harass Sinclair and to compel an unwarranted and unjust result. Consequently, the evidence, if believed, would support the inference that Cooper engaged in a pattern of conduct which, if it did not establish that he was neither disinterested nor impartial in the performance of his duties, did, at least, give the appearance that his special and personal interest was in conflict with his public obligation to administer justice fairly and impartially.

In sum, the evidence concerning Cooper's activities, if believed, would be sufficient to show at least that the

conduct of the State's Attorney gave the appearance of violating the standards established by Maryland law. It also, if believed, would create the danger of substantial prejudice to the defendant resulting from his being unnecessarily subjected to prosecution for a reason other than the preservation of the public interest. Under such circumstances the discretion of the State's Attorney in instituting the instant criminal prosecution would be, in my view, grossly abused.

I believe that a prosecuting attorney who abuses his discretion by initiating and acting in a criminal case in which he has a special or personal interest which conflicts with the fair and impartial discharge of his duties should be disqualified and that a conviction obtained when the prosecutor has such an interest should be reversed. Some state courts which have considered this problem agree.[6] While there is no precedent in Maryland with respect to this question, the Court of Appeals and this Court have considered similar questions with respect to the grand jury system.

In Maryland it has long been recognized that there is no statutory or other requirement that grand jurors be unprejudiced. *Coblentz v. State,* 164 Md. 558, 570-71, 166 A.

---

6. State v. Snyder, 237 So. 2d 392, 395 (La. 1970); State v. Cox, 167 So. 2d 352, 357-58 (La. 1964); State v. Marcotte, 86 So. 2d 186, 188 (La. 1956); Tate, *supra,* at 171 So. 111-13; State v. Jones, 268 S. W. 83, 85-86 (Mo. App. 1924); Hall, *supra,* at 217 P. 231; *see* Conyers v. People, 155 P. 2d 988, 990 (Colo. 1945) (probation hearing reversed). *But see* Garton v. State, 454 S.W.2d 522, 526 (Mo. App. 1970); State v. Goodwin, 158 S.E.2d 195, 196 (S. C. 1967); State v. Rosengard, 219 A. 2d 857, 858 (N.J. 1966); State v. Melerine, 109 So. 2d 454, 457-60 and 109 So. 2d 471, 474-78 (La. 1959); People v. Tibbitts, 217 P. 217, 219 (Cal.Dt.App. 1925). *See generally* Annotation, *Disqualification of Prosecuting Attorney on Account of Relationship with Accused,* 31 A.L.R.3d 953 (1970).

Louisiana has a statute which requires a judge to excuse a prosecuting attorney where certain specified causes exist, one being a "personal interest adverse to that of the prosecution," which cause the Louisiana cases cited above have construed as requiring disqualification of a prosecuting attorney for personal interest in convicting the accused. La.Stat.Ann. — Rev.Stat. (1950) 15:310, 310 (3). While Missouri also has a statute which grants a court power to appoint a special prosecutor to replace the regular prosecutor where he is "interested," the Missouri courts have recognized the inherent power of the court to so appoint a temporary prosecutor. Jones, *Supra,* at 262 S. W. 85; *see* Mo.Rev.Stat. (1969) § 56.110, formerly Mo.Rev.Stat. (1919) § 742.

45, 50-54 (1933); *Hopkins v. State*, 24 Md. App. 53, 63-64, 329 A. 2d 738, 744-45 (1974). Yet in *Coblentz* the Court of Appeals recognized, in dicta, that a direct pecuniary interest in a prosecution would serve to disqualify a grand juror. The test for determining the existence of such disqualification, according to the Court of Appeals, was whether the grand juror would "gain or lose" by a conviction or acquittal of the accused.

Over a century ago the Court of Appeals decided the case of *Clare v. State*, 30 Md. 163 (1869). There the defendant pled in abatement to the indictment against him that the mandates of the law had not been followed in the selection of the grand jury, because its members had been selected, not by judges as the law required, but by a court clerk. The lower court determined this allegation to be factually correct, but held that it concerned a mere informality and not a fatal defect. The plea was overruled and the defendant convicted. On appeal the Court of Appeals reversed the judgment of conviction, notwithstanding the fact that the defendant had not alleged or proved any specific prejudice to him from the unlawful method of selection. The Court of Appeals there said at 30 Md. 177-178:

> "It is indispensable, in a criminal trial, that the grand inquest required to find the indictment should be constituted of 'good and lawful men,' and if the body, or any part of it, lie under substantial disqualification, they may be challenged by the prisoner before the bill is presented; or after the finding, the prisoner may plead the objection in abatement thereof.
>
> "We fully concur in the remarks of Judge Hitchcock, in his dissenting opinion in *Boyington v. State*, 2 Porter, 143, which was subsequently followed in the Alabama decisions overruling the opinion of the majority in that case, 'what principle of public policy can be more sacred than that the sources of justice should be pure? . . . Ought not the court rather to say that indictments found by persons not good and lawful men, shall be revoked,

annulled and holden for none, forever? If I am to be put on trial for my life, let my accusers, at least, be *boni et legales homines.*' It results from these views that there has been no legal trial and conviction of the prisoner in this case.

"Under any government of law the trial of persons accused of crime, from its commencement to the conclusion, should be scrupulously conducted according to the requirements of the law. Not only the sacred administration of public and private justice, but the good order of the community, the security and protection of life, liberty and property, cannot be preserved, except by the inflexible maintenance and impartial enforcement of the statutory, as well as the fundamental laws of the land. Where the substantial provisions of the law have not been regarded, and a party has been convicted in violation thereof, and without their sanction, such party is entitled to a reversal, if legal steps in due time are taken to obtain redress.

"For these reasons the judgment of the court below overruling the pleas in abatement, and the final judgment of conviction of the prisoner, must be reversed; but this does not entitle him to be discharged, or exonerate him from a legal trial for the same offense. He may be held under the original commitment or *capias*, until a new in-dictment is framed, under which a trial may be had; or until he is discharged in due course of law." (Citations omitted.)

The same principles were affirmed and quoted in *State v. Vincent*, 91 Md. 718, 732, 47 A. 1036, 1040 (1900), and *State v. Madison*, 240 Md. 265, 269, 213 A. 2d 880, 883 (1965); *see Peters v. Kiff*, 407 U. S. 493, 92 S. Ct. 2163 (1972); *Cassell v. Texas*, 339 U. S. 282, 70 S. Ct. 629 (1950). *See also Beck v. Washington*, 369 U. S. 541, 546, 82 S. Ct. 955, 958 (1972) (dicta), 369 U. S. 558, 82 S. Ct. 964 (dissenting opinion, Black, J.), 369 U. S. 579, 82 S. Ct. 975 (dissenting opinion, Douglas, J.).

Viewed in a narrow perspective these cases establish that when a grand juror is disqualified by virtue of a direct pecuniary interest in the outcome of a criminal prosecution, or when the method of selection of a grand jury is violative of law, the defendant is entitled to a reversal even though no actual prejudice is alleged or proved. Viewed in a broader perspective these cases establish that where there is inherent unfairness or a violation of law during the accusatory phase of a criminal prosecution reversal is warranted even in the absence of an allegation or proof of actual prejudice.

I am convinced that these principles are applicable to the instant case. Accusers, be they the grand jury or the State's Attorney, should be "good and lawful men." A State's Attorney, like a grand juror, who has a direct pecuniary interest in the outcome of a criminal prosecution, should be disqualified. Moreover, a prosecutor who exercises his duties in a manner contrary to the requirements of the law, like a grand jury which is selected in a way contrary to the requirements of the law, creates a fatal defect in the accusatory phase of the criminal prosecution. Continuation of the American concept that we are to be governed by the rules of law requires that the people have faith that justice can be obtained through our legal system.[7] ABA, Code, Canon 9, Ethical Consideration 9-1. That faith is justified and can exist only when the people are convinced that justice is administered evenhandedly. The exercise of a State's Attorney's broad prerogative to determine whom, what and how to prosecute must adhere rigidly to the standards of conduct established by law. Any act not in accordance with those standards, because it impairs the confidence of the people in the integrity of the exercise of the State's sovereign

---

7. The concept of the integrity of the judicial process and the sanctity of justice, long a part of our cultural heritage, was expressed eloquently in the year 1215 in the great English document of liberties, the Magna Carta:

"To none will we sell, to none will we deny, to none will we delay, right or justice."

See R. Stringham, *Magna Carta, Fountainhead of Freedom*, p. 235 (1966).

power to indict and prosecute, tends to destroy the people's faith in the fair and equal administration of justice. Such acts are not to be sanctioned or condoned by the courts. When they occur reversal is warranted notwithstanding the absence of any allegation or proof of actual prejudice.

Here, there was evidence adduced, which, if believed, would support the inference that the prosecution was brought by a person who had a direct pecuniary interest in the outcome of the criminal prosecution. He and his assistant would stand to gain financially, if as a result of successive prosecutions and convictions, Sinclair capitulated to their previous demands and either purchased the notes held by their clients or "voluntarily" dismissed a pending civil appeal. Under such circumstances, both should have been disqualified. Moreover, there was evidence adduced here which, if believed, would give the appearance of a violation of the fundamental requirements of law that a State's Attorney act fairly and impartially in the discharge of his duties and the exercise of his discretion. I could not sanction or condone the conduct of the State's Attorney and his assistant if, in fact, it was as sworn to by the defendant. Accordingly, under such circumstances I would reverse the convictions, notwithstanding the absence of an allegation or proof of actual prejudice to Sinclair.

Here, however, the trial court, viewing the facts as sworn to by Sinclair as "bald allegations," held no hearing with respect to the question of whether the State's Attorney and his assistant engaged in a course of conduct which gave the appearance of impropriety. Thus, no findings were made as to whether the facts sworn to by Sinclair were true. Under these circumstances I would neither affirm nor reverse the judgments below but would remand the case to the trial court for an evidentiary hearing and findings of fact on this question. If the trial court were to find that Cooper and Wadkovsky did not engage in a questionable course of conduct, the convictions would stand. If the trial court were to find to the contrary, it should then dismiss the informations and, pursuant to Maryland Code (1974) *Courts and Judicial Proceedings Article,* § 2-102 (a) [formerly

codified as Code (1957, 1973 Repl. Vol.) Art. 26, § 11].[8] appoint assistant counsel for the State who should then determine on a fair and impartial basis whether the public interest requires either that a new criminal prosecution be instituted or that Sinclair be discharged. I would so do not only to protect the defendant here from the danger of substantial prejudice, but also because only by so doing could I be certain that the people's belief in the impartial, unbiased and unprejudiced use of the State's sovereign power to indict and prosecute would be vindicated and reaffirmed.

I respectfully dissent.

---

**8.** This provision confers upon a judge the statutory right to appoint assistant counsel for the State whenever the public interest so requires. *See* note 3, *supra.* The reviser's note to § 2-102 states that this section is based both on Art. IV, § 9 of the Maryland Constitution which grants judges broad authority to appoint personnel and on a number of statutes and rules which provide for such appointments, including former Art. 26, § 11. The reviser also indicates that the constitutional provision, Art. IV, § 9, is apparently declarative of the common law.

While the present *Courts Article* provides that an appointment may be made "if advisable in a specific proceeding," its forerunner, Art. 26, § 11, provided that such appointments could be made whenever "public interest requires it."